## COMMONWEALTH *vs.* DAMION LINTON.

Middlesex. December 10, 2009. - April 16, 2010.

Present: MARSHALL, C.J., IRELAND, COWIN, CORDY, & GANTS, JJ.

*Homicide. Practice, Criminal,* Capital case, Required finding, Instructions to jury, Assistance of counsel. *Malice. Intent. Evidence,* Spontaneous utterance, Testimonial statement, Relevancy and materiality, Intent, Videotape, Scientific test, Statistics. *Search and Seizure,* Inevitable discovery. *Deoxyribonucleic Acid.*

At the trial of an indictment charging murder in the first degree, the judge did not err in denying the defendant's motion for a required finding of not guilty, where the evidence, aside from evidence of intent and of conduct that suggested the defendant's consciousness of guilt, was sufficient as a matter of law to support the jury's finding that the defendant strangled the victim and that he did so with extreme atrocity or cruelty, i.e., in circumstances indicating his indifference to the victim's suffering, the victim's high degree of conscious suffering, and the overwhelming force he applied during the strangulation. [543-547]

At a murder trial arising from the defendant's strangulation of the victim, the judge did not err by admitting in evidence the victim's previous statements to her father regarding the defendant's prior assault on her, where the physical assault, in which the defendant choked the victim until she became unconscious, was an external shock sufficiently startling to serve as the basis of the victim's excited utterance twenty minutes later [547-549]; where there was nothing to suggest that the statements were testimonial in nature [549-550]; and where the probative value of the evidence in showing the hostile relationship between the defendant and the victim was not substantially outweighed by the risk of unfair prejudice [551].

The judge at a murder trial did not err in declining to give the defendant's requested instruction on involuntary manslaughter, where no reasonable jury could have concluded, in light of the undisputed testimony of the medical examiner regarding the physical force used in strangling the victim, that the defendant did not intend to cause the victim grievous bodily harm or did not intend to do an act that, under the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood that death would follow. [552-553]

There was no merit to a criminal defendant's unsubstantiated claims, set forth in a motion for a new trial, that his trial counsel rendered ineffective assistance by failing to present evidence that some third party, and not the defendant, was responsible for the murder [553-555], or by failing to challenge the testimony of the Commonwealth's medical examiner regarding the approximate time of the victim's death [555-556]; thus, where no

substantial issue was raised, the motion judge (who was also the trial judge) did not err in deciding the motion on the basis of the affidavit and his familiarity with the trial [556].

At a murder trial, there was no error in the admission in evidence, under the inevitable discovery doctrine, of a videotape of the defendant making a bank transaction, where the judge could have found that it was certain, as a practical matter, that the police would have learned of the transaction and procured the videotape without reliance on a receipt found in an illegal search of the defendant's backpack. [557-559]

At a murder trial, the admission in evidence of certain expert testimony, unaccompanied by statistical explanation of its meaning, did not result in a substantial likelihood of a miscarriage of justice, given the limited probative value of the evidence (namely, that the defendant could not be excluded as a potential source of deoxyribonucleic acid detected from fingernail scrapings taken from the victim's left hand) when considered in the context of the evidence as a whole. [559-560]

INDICTMENT found and returned in the Superior Court Department on March 22, 2005.

Pretrial motions to suppress evidence were heard by *Peter M. Lauriat*, J.; the case was tried before him, and a motion for new trial, filed on February 25, 2008, was considered by him.

*James M. Doyle* for the defendant.

*Loretta M. Lillios*, Assistant District Attorney, for the Commonwealth.

GANTS, J. A jury in the Superior Court convicted the defendant of murder in the first degree on a theory of extreme atrocity or cruelty for the strangulation of his wife, Andrea Harvey.[1] Represented by new counsel, the defendant appeals from his conviction and from the order of the trial judge denying his motion for a new trial. On appeal, the defendant argues that the evidence presented at trial was insufficient to support the jury's verdict and that we should reverse the judge's denial of his motion for a required finding of not guilty. In the alternative, he argues for a new trial, claiming that the judge erred by admitting in evidence the victim's account of the defendant's prior assault on her and by refusing to instruct the jury on the elements of involuntary manslaughter as an alternative, lesser

[1] The Commonwealth proceeded on a theory of deliberate premeditation as well as extreme atrocity or cruelty. The jury found the defendant guilty only under the latter theory.

charge to murder. Finally, the defendant claims that he was denied effective assistance of counsel by the failure of his trial counsel to challenge certain aspects of the Commonwealth's case. We conclude that the evidence was sufficient to sustain the verdict and that the judge's rulings were not error. We also conclude that the defendant's ineffective assistance of counsel claim is without merit. Accordingly, we affirm the defendant's conviction and the denial of his motion for a new trial. After a complete review of the record, we also conclude that there is no basis to exercise our power under G. L. c. 278, § 33E, to reduce his conviction to a lesser degree of guilt or to order a new trial.

1. *The evidence at trial.* Because the defendant challenges the sufficiency of the evidence, we summarize in detail the evidence, considering it in the light most favorable to the Commonwealth and reserving certain details for our analysis of the other issues raised on appeal.

At approximately 2 P.M. on Thursday, February 24, 2005, Cedric and Shirley Harvey discovered the body of their daughter, Andrea Harvey, in her apartment. The victim was lying on the floor, "somewhat on her side," curled up in something like a "fetal" position. She was dressed in a sweatsuit and lay on a sheet next to the apartment's baseboard heater, wrapped to the neck in blankets. The thermostat in the apartment was set to eighty-five degrees. The victim's body was stiff; rigor mortis had set in. Blood or other bodily fluids had seeped out of her mouth and stained the carpet and the sheet. On the floor by her head was the victim's cellular telephone and a cup of clear liquid, which appeared to be water. The victim's father dialed 911 on his cellular telephone, and a Cambridge police officer arrived at the scene minutes later.

The front door of the apartment had been locked when the parents arrived at the apartment. They opened the two door locks with keys they had obtained from the building's rental agent. Police officers who investigated the crime scene testified that there were no signs of damage or forced entry into the apartment. The back door of the apartment was inaccessible because it was blocked with furniture, exercise weights, and other items. All the apartment's windows were closed securely.

The Commonwealth's medical examiner, Dr. Richard Evans,

who conducted the autopsy, testified that the victim's death was due to manual strangulation. The physical evidence of the strangulation included multiple abrasions to the right side of the victim's neck below her jaw, consistent with fingernail marks, and a larger bruise on the left side of the victim's rib cage that, from its size and the pressure required to form it, could have been caused by the force of a knee on the victim's chest. The nature of these abrasions indicated that they had been inflicted while the victim was still alive.

Dr. Evans testified that, to determine the time of the victim's death, he considered the presence of rigor mortis, various indications of decomposition, and signs of lividity in the corpse.[2] While acknowledging that estimating a time of death is an inexact science, he offered the opinion that the victim could have died any time from "eight hours up to twenty-four hours, maybe even slightly beyond twenty-four hours" before the time her body was photographed by police on February 24. Dr. Evans opined that, while in normal circumstances it would have taken two to three days to reach the state in which the victim's body was discovered, here, because of the high temperature in the apartment, that time had been cut "[r]oughly in half." At the earliest, the medical examiner's estimate would have placed the time of the victim's death around midday on Wednesday, February 23.

The parents last saw the victim on the evening of Tuesday, February 22. The three had gone for a walk together, and the victim had seemed "positive" and "hopeful." The victim's father had left his wife and daughter around 7 P.M., but the two women continued walking through Cambridge and Boston for two more hours. After the victim stopped at a video rental store, her mother drove her to Cambridge and dropped her off sometime around 9:15 P.M. Just before 10 P.M., they spoke once more on the telephone.

The parents did not see the victim on February 23, but the victim's mother called her daughter's cellular telephone at 8:16 A.M. and left a voice-mail message when the victim did not answer. The victim, a mathematics teacher at East Boston High

---

[2]Dr. Evans explained that lividity is a term used to describe the bluish or purplish blush that appears on the skin after circulation ceases and gravity causes blood gradually to settle at the lowest point in the body.

School, was on vacation on February 23, but she had discussed going to the school to clean her classroom that day with another teacher, Matthew Glavin. When Glavin called the victim's cellular telephone that morning at 10:15 A.M. to offer her a ride to school, the victim did not answer.

The defendant was married to the victim, but had been having an affair with Latricia Carter, which was discovered by the victim on the morning of February 23. Carter testified that she and the defendant had met in early January 2005, and first had sexual relations on February 14. They sometimes spent evenings together at Carter's home, and she would visit him in the mornings or at midday at his apartment; she never visited his apartment at night. The defendant did not tell Carter that he was married. When they were together, the defendant would receive telephone calls from someone he described as his "ex-girlfriend." He often told Carter that this former girl friend had repeatedly threatened that, should he break up with her, she was going to purchase "a bottle of pills to do something to herself and make everyone think that he did it to her."

On the morning of February 23, Carter had an appointment to take a series of work-related tests at a training facility in Somerville. Because the testing facility was near the defendant's apartment, she and the defendant made plans for her to visit before her morning appointment. Carter arrived outside the defendant's apartment building driving her father's pickup truck. She rang the doorbell in the building's first-floor entry twice, but no one answered or let her in. Just as Carter decided to leave, the defendant came downstairs; he was talking on a cellular telephone. When the defendant finished his call, Carter asked him why he had carried on his telephone conversation standing in the entryway when the weather was so cold. She then heard a loud noise from upstairs. The defendant explained, "Well you know that crazy, crazy girl I told you about, she's upstairs." Carter left the apartment entryway and returned to the truck; the defendant followed her and let himself in by the unlocked passenger side door. Carter began to shout at the defendant, demanding to know why the woman was in his apartment and the nature of their relationship. Eventually, the defendant admitted that the woman upstairs had not simply let herself in, but that she was there every

night, and that she lived with him. As Carter and the defendant continued to argue, a young, "dark-skinned" woman with her hair in dreadlocks, a description matching that of the victim, came out to the street, leaned over to look in the window of the truck, and exclaimed, "Oh, my gosh, another woman." She then told the defendant, "Give me my phone," and he passed the telephone to her through the open truck window.

After being discovered by the victim, Carter and the defendant drove away and began to circle the neighborhood. At one point, they passed the victim, who was walking on the street one block from the apartment she shared with the defendant. Carter then dropped the defendant off and drove to the testing center, arriving sometime before 8:45 A.M. After completing two tests, she went to her office, where the defendant telephoned her around 1:30 P.M. that afternoon. He told her that after she had left, he and the victim had argued about her and that he "had to pack a bag and leave" because the victim had started saying again that she was going to hurt herself and blame it on him. He asked if he could come by and pick up her house keys so he would have a place to stay, but Carter refused.

Early in the afternoon of February 24, the victim's mother received a telephone call from the defendant. The defendant told her that he was calling from North Carolina, where his brother lived and where he had gone to pick up some things that his mother had sent from Jamaica. The defendant told the mother that he had been trying unsuccessfully to get in touch with the victim since leaving the previous day, and that her telephone kept ringing; he said he was worried because she had warned him that she would "hurt herself" if he ever left her. The defendant said that the victim had on an earlier occasion taken "some stuff" to try to hurt herself, but that he had revived her with some "bush remedy." He told her mother that he had seen the victim when he returned home close to midnight on February 22, that he awoke at 8 A.M. on February 23, and that he had then left for North Carolina at 10 A.M. that morning. The defendant said that the victim had "murmured something" in response when he spoke to her on leaving. Alarmed by what she heard, the victim's mother asked her husband to take the telephone. He asked the defendant when he had last seen the victim. Contrary to what he had just told the mother, the defendant now

told the father that he had not seen the victim at all on the morning of February 23. He told the father that the victim had been "gone to the store" when he awoke at 8 A.M. and that she had not returned by the time he left at 10 A.M. The victim's mother, who had picked up another telephone extension, confronted the defendant with the contradiction, and demanded to know if he had hurt her daughter. The defendant denied the accusation, claiming, "No, Mrs. Harvey. I wouldn't hurt her. I love her." Now quite worried, the parents went to their daughter's apartment to investigate, where they found her body.

State Trooper Pi Heseltine reached the defendant's brother in North Carolina by telephone on Thursday evening, February 24, and informed him of the victim's death. On Friday, February 25, Trooper Heseltine spoke by telephone with the defendant, who was staying with his brother. In this initial interview and thereafter, the defendant gave Trooper Heseltine and the other investigating officers shifting explanations of the events of the preceding week.

In his telephone interview with Trooper Heseltine on February 25, the defendant said that he had spoken with the victim by telephone on the evening of Tuesday, February 22, before coming home, and that they had argued about money and some "silver beads" and "soap" that he had taken from her. He said that the victim was asleep when he returned to the apartment that night, and that he did not see her the next day from the time he awoke at 8 A.M. until he left for Florida at noon. The defendant told Trooper Heseltine that the victim had asked him to leave and that he had decided to "give her some time." He said that, on leaving the apartment on Wednesday, his plan was to go to Florida to visit his Aunt Sonia, although he admitted that he had not made any prior arrangements; he was just going to go to Florida and find her. In response to subsequent questioning, the defendant could not tell police where in Florida his aunt lived or anything else about her.

The defendant told Trooper Heseltine that he had locked the Cambridge apartment when he left on February 23 and that he still had his keys with him. After leaving the apartment, the defendant said, he took a subway train to the Dorchester section of Boston, intending to see his friend, Van, but on the way and by chance, he ran into a friend named Jonathan who told the

defendant he was also going to Florida and agreed to give him a ride. He was unable to tell Trooper Heseltine or the officers who questioned him later anything about Jonathan apart from saying that he was a friend from Jamaica and that he drove a Honda automobile. The defendant said that he and Jonathan left Boston sometime between 2 or 3 P.M. on February 23 in Jonathan's automobile. En route to Florida, he said, they stopped at a little store somewhere in New York, where he used a public telephone to contact the victim and leave her a voice-mail message.[3] The defendant said that, after the stop in New York, he and Jonathan continued driving south but, when they reached North Carolina, he decided to stay with his brother instead of continuing on to Florida.[4]

The defendant said that Jonathan dropped him off near a Red Carpet Inn in Rocky Mount, North Carolina, around 6 A.M. on February 24, and then continued on to Florida. He said that he stayed at the inn until his brother picked him up around 10 A.M. He told Trooper Heseltine that he had tried again to reach the victim by telephone after arriving at his brother's house and left her another voice-mail message.[5] Later that day, the defendant

[3]A tape recording of the voice-mail message was played for the jury, but no transcription was made of the message and, apparently inadvertently, the recording was not entered in evidence. Telephone records introduced in evidence at trial indicated that the telephone call was actually made at 7:51 P.M. from a public telephone at the Port Authority bus terminal in New York City. Evidence showed that a Greyhound Bus Lines bus was scheduled to leave the terminal at 7:30 P.M. on the evening of February 23 and arrive in Rocky Mount, North Carolina, where the defendant acknowledged he stopped, the following morning. A customer service supervisor testified that it was not an infrequent occurrence for a bus to leave late from the bus terminal or, if the scheduled bus were to sell out, for Greyhound to arrange to send a second bus on the same route shortly after the originally scheduled departure. The telephone used to make the call was directly across from the gate from which the bus to North Carolina regularly departed.

[4]When the defendant telephoned Trooper Heseltine on February 26 to speak further, the defendant revised his earlier account of how he had come to arrange the trip south with his friend Jonathan. He now said that he had run into Jonathan on the night of February 22, not the afternoon of February 23, and that they had then agreed to travel to Florida together. When Trooper Heseltine pointed out the inconsistency, the defendant revised his account once more, and said that he had made a mistake and that, in fact, he and Jonathan had made their plan on February 23 as he had originally said.

[5]A tape recording of this voice-mail message was also played for the jury, but

applied for employment at the Wal-Mart department store where his brother was employed. He told the general manager of the store that he had had a dispute with his wife in Boston and that he was moving to Raleigh and looking for full-time work.

On Saturday, February 26, the defendant telephoned the victim's friend, Denise Williams, from North Carolina and discussed the victim's death. The defendant told Williams that he and the victim had "got into a fight, and things went bad, and I left."

When the defendant arrived at the department store to start work that evening, he was arrested by local police officers, assisted by a Cambridge police officer and a Massachusetts State trooper who had traveled to North Carolina to investigate the murder. The defendant waived his Miranda rights, and in a two-hour interview with police, he denied killing or hurting the victim. When asked who else might have been responsible, the defendant said that a former boy friend of the victim might have committed the murder. In the course of this interview, the defendant spoke generally of "our problems," referring to his relationship with the victim, and described arguing with her over bills.[6] He told these officers that their fighting had one time led to a physical altercation in which he "grabbed [the victim] by the back of the neck."[7]

Before his arrest on February 26, the defendant telephoned Carter and made plans to see her later that day; the defendant did not mention to her that he was in North Carolina. At 4 A.M. on February 27, Carter accepted a collect telephone call from the defendant, who told her that the victim was dead and he was being held in jail in North Carolina as her suspected killer. He denied responsibility for the murder. Carter did not hear again from the defendant until late May or early June of 2005,

---

no transcription was made of the message, and the recording was not entered in evidence. See note 3, *supra.*

[6]There was other evidence of conflict between the defendant and the victim. At trial, the victim's father testified that he had attempted to help the victim and defendant with their financial problems by preparing a shared budget for the couple. The defendant complained to him that the victim was "difficult to live with" and that he was not used to being "bossed around" by a woman.

[7]At trial, her father testified that in September, 2004, the victim told him about an argument with the defendant that had quickly escalated into a violent struggle in which the defendant had choked her until she passed out. We discuss this incident in detail below.

when the defendant telephoned her and told her not to go to court because if she were to testify he would go to jail for the rest of his life.

During the crime scene investigation, swabs from the victim's mouth and vagina, scrapings from beneath the victim's fingernails, and skin swabs from the victim's neck were sent for a type of deoxyribonucleic acid (DNA) analysis known as Y-STR testing, which looks only at DNA found on the Y chromosome, found exclusively in males.[8] Cassie Johnson, the forensic DNA analyst from Orchid Cellmark who conducted the Y-STR testing, testified that only on one sample, which came from scrapings taken from under the fingernails of the victim's left hand, did analysis reveal male DNA in an amount sufficient to generate a "partial profile." Johnson looked at seventeen different areas or "markers" on the Y chromosome, and obtained results at thirteen of the seventeen markers from the male DNA found in the fingernail scrapings. Each of these thirteen markers matched the comparable markers from the known DNA taken from a saliva sample provided by the defendant. Based on these results, Johnson opined that the defendant could not be excluded as the potential source of the male DNA detected from the fingernail scrapings taken from the victim's left hand.

2. *The defendant's motion for a required finding.* At the close of the Commonwealth's case, the defendant moved for a required finding of not guilty, pursuant to Mass. R. Crim. P. 25, as amended, 420 Mass. 1502 (1995), and the judge denied the motion. The defendant presented no witnesses or other evidence. The defendant argues on appeal that the judge's denial of the motion was error, because the evidence was insufficient as a matter of law to support the jury's finding that he committed the murder and that he committed it with extreme atrocity or cruelty. The defendant acknowledges that the prosecution introduced evidence of motive and of conduct that suggested the defendant's consciousness of guilt. He argues, however, that this evidence is

[8]The forensic deoxyribonucleic acid (DNA) analyst from Orchid Cellmark who testified explained that Y-STR testing is often used when there is a large amount of female DNA and possibly only a small amount of male DNA. In such instances, standard DNA testing may "drown out" the male contributor's DNA because so much female DNA is present. This type of testing would not reveal DNA left by a theoretical female assailant.

insufficient by itself to support a conviction and that the balance of the Commonwealth's case relies on the piling of inference on top of inference in a manner that cannot justify a finding of guilt beyond a reasonable doubt.

In reviewing the denial of a motion for a required finding, we must determine "whether the evidence offered by the Commonwealth, together with reasonable inferences therefrom, when viewed in its light most favorable to the Commonwealth, was sufficient to persuade a rational jury beyond a reasonable doubt of the existence of every element of the crime charged." *Commonwealth* v. *Lao*, 443 Mass. 770, 779 (2005), *S.C.*, 450 Mass. 215 (2007), quoting *Commonwealth* v. *Campbell*, 378 Mass. 680, 686 (1979). See *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-678 (1979) (concluding this standard conforms to Federal constitutional requirement announced in *Jackson* v. *Virginia*, 443 U.S. 307, 318-319 [1979]). In reviewing the sufficiency of the evidence, we keep in mind that the evidence relied on to establish a defendant's guilt may be entirely circumstantial, *Commonwealth* v. *Lao, supra*, and that the inferences a jury may draw from the evidence "need only be reasonable and possible and need not be necessary or inescapable." *Id.*, quoting *Commonwealth* v. *Longo*, 402 Mass. 482, 487 (1988). From the evidence admitted at trial, the jury could reasonably have concluded that the victim could have been strangled only by someone who had the keys to her apartment, because the door was locked when her parents found her on February 24, the victim's keys were found inside the apartment, and police investigation discovered no signs of forced entry. It was therefore significant that the defendant admitted to Trooper Heseltine that he had locked the apartment when he left and that he still had keys with him when she spoke to him on February 25.

The evidence also established a chronology that permitted the jury to conclude that the defendant had ample opportunity to commit the crime. Evidence showed that the victim was alive around 8 A.M on February 23, when she discovered the defendant with Carter and demanded the return of her cellular telephone. That telephone was found on the floor near her body on February 24, but no outgoing call had been made from it after 8:23 A.M on February 23, and the victim did not answer when

her colleague called that morning at 10:15 A.M to offer her a ride to school. The jury reasonably could infer that the defendant was inside the apartment at least as late as 12:32 P.M. on February 23, when a call from the land-line telephone in the apartment was placed to his mother's telephone number in Jamaica. A videotape from the Cambridge Trust bank in Kendall Square, which was only a ten-minute walk from the apartment, showed the defendant withdrawing one hundred dollars from the bank's automated teller machine (ATM) at 1:30 P.M.

The jury also reasonably could infer that the defendant left the apartment without knowing where he was going to stay that night, because he telephoned Carter at work at approximately 1:30 P.M. and asked to stay at her house. The evidence showed that after she refused, he fled to New York City, arriving at the Port Authority bus terminal no later than 7:51 P.M., when he telephoned the victim's cellular telephone from a public telephone near the gate where a Greyhound bus was leaving for North Carolina.

The evidence showed the defendant had a motive to kill the victim. By confronting the defendant when he was with Carter in the pickup truck, the victim had endangered his sexual relationship with Carter, whom he had described as his "soul mate." His relationship with the victim had already begun to sour. They were no longer sleeping in the same bed, and he had complained to her parents that the victim was difficult to live with and that he was not used to be being "bossed around" by a woman.

The jury also reasonably could have inferred that the killer intended to leave the impression that the victim had died by suicide by placing a glass of clear liquid by her head.[9] This, too, pointed to the defendant as the killer, because he told the victim's parents that the victim had overdosed on sleeping pills earlier, told Williams about his fear that the victim would do harm to herself, and told Carter of his concern that the victim might kill herself and blame him for her death.

The jury reasonably could have concluded that the victim had been killed inside the apartment before the defendant fled in the early afternoon on February 23. The medical examiner's opinion

---

[9]The liquid was tested by a chemist with the State police crime laboratory and found to contain no alcohol, drugs, or other harmful substance.

as to time of death was admittedly inexact, and did not exclude the possibility that the victim had been strangled before the defendant left the apartment. The alternative explanation that, shortly after the defendant had left, another person entered the victim's apartment, strangled her, and then locked the apartment with both keys was effectively negated by the defendant's conflicting and improbable descriptions of what happened on February 23, which revealed the defendant's consciousness of guilt. Viewed in its entirety, the evidence was more than adequate to allow a rational jury to find, beyond a reasonable doubt, that the defendant murdered the victim.

The defendant next argues that there was insufficient evidence to support the jury's verdict that the manner of the killing was extremely atrocious or cruel under the criteria established by *Commonwealth* v. *Cunneen*, 389 Mass. 216 (1983) (*Cunneen*). We disagree.

To convict a defendant of murder in the first degree based on extreme atrocity or cruelty, a jury must find the presence of one or more of the *Cunneen* factors in the underlying killing.[10] See *Commonwealth* v. *Hunter*, 416 Mass. 831, 836-837 (1994), *S.C.*, 427 Mass. 651 (1998). The medical examiner testified that the compressive force the killer applied to the victim's neck in strangling her was so strong that it had caused a separation of the hyoid bone, located at the base of the victim's tongue, under the jaw. The circulatory pressure that resulted from the strangling was so severe that it caused extensive bleeding in the victim's eyes. Bite marks and hemorrhaging on the victim's tongue indicated that she had struggled to breathe against the suffocating grip that closed down her airway. The medical examiner explained that it would have taken about ninety seconds of "constant or near-constant pressure" on the victim's airway before she lost consciousness and ceased to breathe. Even after the

---

[10]Under *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983), the jury are to consider the following factors: (1) whether the defendant was indifferent to or took pleasure in the victim's suffering; (2) the consciousness and degree of suffering of the victim; (3) the extent of the victim's physical injuries; (4) the number of blows inflicted on the victim; (5) the manner and force with which the blows were delivered; (6) the nature of the weapon, instrument, or method used in the killing; and (7) the disproportion between the means needed to cause death and those employed.

victim's circulatory and respiratory systems had shut down, the unconscious victim might still have been revived within a further period of up to six minutes had she received cardiopulmonary resuscitation. From this testimony, a jury reasonably could have found multiple *Cunneen* factors: indifference to the victim's suffering, the victim's high degree of conscious suffering, and the overwhelming force applied during the strangulation.

The defendant contends that the medical examiner's testimony suggested nothing more than that the force used was sufficient to cause death by strangulation and that it was applied for the period necessary to render the victim unconscious. He complains that if such evidence is sufficient to support a finding that the manner of the victim's killing was extremely atrocious or cruel, every murder by strangulation could be found extremely atrocious or cruel. Because every killing invariably includes some degree of atrocity or cruelty, the evidence supporting a verdict of murder by extreme atrocity or cruelty "must be of such a character as to show that the crime was committed under circumstances indicating something more than ordinary atrocity or cruelty." *Commonwealth* v. *Connolly*, 356 Mass. 617, 628, cert. denied, 400 U.S. 843 (1970), quoting *Commonwealth* v. *Knowlton*, 265 Mass. 382, 388 (1928). We need not decide whether every murder by strangulation might be found extremely atrocious or cruel, because we are not troubled by the possibility that the inherent brutality of some methods of murder may mean that every murder applying that method may be found to be committed with extreme atrocity or cruelty without evidence of additional, aggravating circumstances. A murder committed through a method of killing that is by its nature slow and painful need not be shown slower or more painful than the average murder employing that method to be found extremely atrocious or cruel.

3. *Admission of the victim's excited utterance.* The defendant contends that the judge erred by admitting in evidence, over the defendant's objection, the victim's statements to her father in September, 2004, that the defendant had just strangled her until she became unconscious. The defendant argues that these statements should not have been admitted because they did not fall within the excited utterance exception to the hearsay rule; they constituted testimonial hearsay, whose admission violated his

right to confrontation under the Sixth and Fourteenth Amendments to the United States Constitution; and their prejudicial effect substantially outweighed their probative value.

Following the United States Supreme Court's decisions in *Crawford* v. *Washington*, 541 U.S. 36 (2004) (*Crawford*), and *Davis* v. *Washington*, 547 U.S. 813 (2006) (*Davis*), we review the admissibility of out-of-court statements under a two-step inquiry. *Commonwealth* v. *Simon*, *ante* 280, 297 (2010). First, we determine whether the statement is admissible under our common law of evidence. *Commonwealth* v. *Nesbitt*, 452 Mass. 236, 243 (2008). If it is, we then determine whether admission of the statement is prohibited by the confrontation clause of the Sixth Amendment. *Id.*

Under our common law of evidence, a statement otherwise inadmissible as hearsay may be admitted if it follows an occurrence or event sufficiently startling to render inoperative the normal reflective thought processes of an observer, if the statement's utterance was "spontaneous to a degree which reasonably negate[s] premeditation or possible fabrication," and if the statement tends to "qualify, characterize and explain the underlying event." *Commonwealth* v. *DiMonte*, 427 Mass. 233, 236 (1998), quoting *Commonwealth* v. *Crawford*, 417 Mass. 358, 362 (1994). See Mass. G. Evid. § 803(2) (2010). The rationale that justifies this hearsay exception is that a person who has witnessed a shocking or traumatic event "tends to speak what comes spontaneously to mind, without energy or disposition to invent lies" so her statements may be deemed trustworthy for as long as the stress of the startling event continues. *Commonwealth* v. *Santiago*, 437 Mass. 620, 623 (2002), quoting *Commonwealth* v. *Carrasquillo*, 54 Mass. App. Ct. 363, 368 (2002). In determining whether a statement is admissible as an excited utterance, we afford the trial judge broad discretion and reverse only for an abuse of that discretion. See *Commonwealth* v. *DiMonte*, *supra* at 236; *Commonwealth* v. *Crawford*, *supra*.

The judge did not err by admitting the victim's statement to her father in evidence as an excited utterance. At trial, the victim's father testified that in September of 2004, he received a telephone call from the victim in which she was crying and asked him to come get her. When she called, the victim was

"very upset, pretty much hysterical." When her father arrived outside her apartment ten minutes later, the victim was standing at a public telephone, "still hysterical" and "still crying." The victim's father testified that the victim asked him to go up to the apartment and get her cellular telephone from the defendant. When the defendant said he did not have the telephone, the victim and her father left. On the way back to her father's house, the victim, "still hysterical," told her father that she and the defendant had argued and that he had taken her telephone from her and cut the land-line telephone in the apartment. When she tried to leave the apartment, she said, the defendant blocked her way and began to choke her, and he continued to choke her until she lost consciousness.

A physical attack that leaves the declarant unconscious is an external shock sufficiently startling to serve as the basis of an excited utterance. See *Commonwealth* v. *Snell*, 428 Mass. 766, 777, cert. denied, 527 U.S. 1010 (1999) (victim's statements to neighbor after defendant had tried to kill her by choking and smothering her admissible as spontaneous utterance). We set "no definite and fixed limit of time" beyond which the declarant's utterance may no longer be considered to be made under the influence of the shocking event; "[e]ach case must depend upon its own circumstances." *Commonwealth* v. *DiMonte, supra* at 239, quoting *Commonwealth* v. *McLaughlin*, 364 Mass. 211, 223 (1973). The approximately twenty minutes that passed between the defendant's attack on the victim and her account of the incident to her father falls well within the time period countenanced in cases where we have affirmed the admission of statements as spontaneous utterances. More important, the victim's father testified that the victim remained greatly affected and was "still hysterical" when she spoke. See, e.g., *Commonwealth* v. *Marshall*, 434 Mass. 358, 363-365 (2001) (where victim was "crying and nervous" and "in fear," victim's statement admissible as excited utterance two hours after defendant threatened her with knife to her throat); *Commonwealth* v. *Grant*, 418 Mass. 76, 81-82 (1994) (statements of witness made sixty minutes after murder admissible as excited utterance where witness was "close to hysterical" while being questioned).

We turn next to the admissibility of the statements under the

confrontation clause. Where, as here, the victim declarant was not available to testify at trial and the defendant had no prior opportunity to cross-examine her, admission of the victim's statements would violate the confrontation clause if they were testimonial in nature. See *Davis, supra* at 821; *Crawford, supra* at 53-54; *Commonwealth* v. *Lao*, 450 Mass. 215, 223-224 (2007).[11] Because the victim's statements were not made in a deposition, affidavit, confession, or prior testimony, or in response to law enforcement interrogation, they were not testimonial per se under *Crawford. Commonwealth* v. *Simon, supra*; *Commonwealth* v. *Gonsalves*, 445 Mass. 1, 13 (2005), cert. denied, 548 U.S. 926 (2006). A statement that is not testimonial per se may still be testimonial in fact if "a reasonable person in the declarant's position would anticipate the statement's being used against the accused in investigating and prosecuting the crime." *Id.* Such a determination requires a "fact-specific inquiry" by the judge. *Id.*

There is nothing in the record to suggest that the victim made the statements at issue for any other purpose than to explain to her father what had happened. There is no evidence that the victim reported the assault to the police or sought a protective order against the defendant under G. L. c. 209A, or that she asked her father to do so. A reasonable person in the victim's situation — that is, still crying and hysterical after being choked to the point of unconsciousness — would not have anticipated that her statements to her father would be used against the assailant when she did not report the crime to the police or the court. Consequently, the statements were not testimonial in fact. See *Commonwealth* v. *Lao, supra* at 226-227 (victim's account to daughter of defendant's attempt to run her down with automobile not testimonial); *Commonwealth* v. *Gonsalves, supra* at 3-4, 17-18 (daughter's account of battery by defendant not testimonial when made in response to mother's inquiries within minutes of attack).

---

[11]Although art. 12 of the Massachusetts Declaration of Rights sometimes provides greater protection to defendants than that available under the United States Constitution, in cases involving the hearsay rule and its exceptions, we have held that the protection of art. 12 is coextensive with that of the confrontation clause of the Sixth Amendment to the United States Constitution. *Commonwealth* v. *DeOliveira*, 447 Mass. 56, 57 n.1 (2006), and cases cited.

Having concluded that the statements were an excited utterance that were not testimonial in nature, we also conclude that the judge did not abuse his discretion in finding that the probative value of the evidence was not substantially outweighed by the risk of unfair prejudice. See *Commonwealth* v. *Bonds*, 445 Mass. 821, 834 (2006). We have consistently held that a defendant's prior threats and acts of violence against his spouse may be admitted for the purpose of showing a "defendant's motive and intent and to depict the existence of a hostile relationship between the defendant and the victim." *Commonwealth* v. *Snell*, *supra* at 777 (testimony regarding defendant's earlier attempt to choke and suffocate spouse admissible where defendant accused of asphyxiating spouse by smothering). See *Commonwealth* v. *Cormier*, 427 Mass. 446, 449-450 (1998) (testimony regarding defendant's history of physical attacks and threats against wife admissible to show "defendant's possible motive and intent in killing his wife"). Although the similarity between the earlier reported strangling and the murder presented a risk that the jury would impermissibly consider the defendant's propensity toward this kind of violence in reaching their verdict, the judge gave the jury appropriate limiting instructions to reduce the possible prejudicial effect of the evidence both after the testimony was admitted and in his final charge.[12] Given the probative value of the testimony in showing the hostile relationship between the defendant and the victim, and the limited purposes for which the jury were permitted to consider it, we are satisfied that the judge did not abuse his discretion in concluding that the defendant was not unfairly prejudiced by its admission.

[12]The judge told the jury that they were permitted to consider the prior incident only on the limited issue of the defendant's relationship with the victim and to show his motive, intent, and state of mind with respect to the crime with which he was charged. He told the jury that they could not consider any prior bad act of the defendant as proof that the defendant had a criminal personality or bad character or as an indication that, if he had committed the prior bad act, he must also have committed the crime with which he was charged. Because the victim's father's testimony had been offered toward the end of the second day of trial, the judge gave the limiting instruction the next day, before testimony resumed. The defendant did not object to the delay, and while we find it preferable that the limiting instruction be given the same day as the testimony at issue, we do not find that the delay materially diminished the impact of the limiting instruction on the jury.

4. *Denial of the defendant's requested instruction on involuntary manslaughter.* At the close of evidence, the defendant made a timely request for a jury instruction on involuntary manslaughter. The judge denied the request.[13] The defendant contends that the evidence, viewed in the light most favorable to him, warranted such an instruction and that the judge's refusal was reversible error.

Relying on what he otherwise challenges as improperly admitted hearsay evidence, the defendant argues that, because the victim recovered when he had earlier choked her to the point of unconsciousness, the jury reasonably could have found that he did not act with the intent that would constitute malice.[14] Instead, he contends, the jury reasonably could have found that he acted with the intent warranting a verdict of involuntary manslaughter — intent to commit a battery that the defendant knew or should have known endangered human life. See *Commonwealth* v. *Sires,* 413 Mass. 292, 302 n.10 (1992). See also Model Jury Instructions on Homicide 34 (1999).

We agree that an instruction on involuntary manslaughter is required where any reasonable view of the evidence will permit the jury to find involuntary manslaughter rather than murder. *Commonwealth* v. *Sires, supra* at 301. However, no reasonable view of the evidence would permit such a finding here. Even if we were to assume that the jury reasonably could have concluded that the defendant did not intend to kill the victim but simply intended to render her unconscious, no reasonable jury could have concluded, in light of the undisputed testimony of the medical examiner regarding the physical force used in strangling the victim, that the defendant did not intend to cause the victim grievous bodily harm or did not intend to do an act that,

[13]The defendant did not object to the omission of an involuntary manslaughter instruction at the conclusion of the judge's final jury instructions, but we consider the objection preserved because he objected during the charge conference after the judge declared his intent to deny the defendant's request for the instruction, and the judge assured the defendant that he had preserved his right to appeal the ruling.

[14]A finding of malice necessary to convict a defendant of murder in the first degree may be based on intent to kill, intent to cause grievous bodily harm, or intent to do an act that, in the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood that death would follow. See Model Jury Instructions on Homicide 12 (1999).

under the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood that death would follow. The defendant used so much force in strangling the victim that he caused a separation of the hyoid bone and extensive hemorrhaging in the victim's eyes, and he continued to strangle her for at least ninety seconds until she lost consciousness and ceased to breathe. Having done so, he did not call for emergency aid and left her unconscious behind a locked door. In comparable consequences, we have concluded that the evidence did not justify an involuntary manslaughter instruction. See *Commonwealth* v. *Mendes*, 441 Mass. 459, 475-476 (2004) (risk created by "prolonged and forceful strangulation . . . constitutes a plain and strong likelihood of death"); *Commonwealth* v. *Fitzmeyer*, 414 Mass. 540, 547-548 (1993) (involuntary manslaughter instruction not warranted when evidence indicated defendant choked victim to death); *Commonwealth* v. *Garabedian*, 399 Mass. 304, 315-316 (1987) (involuntary manslaughter instruction not warranted when defendant twice strangled victim and then threw three large rocks at victim's face). Where, as here, the evidence did not warrant an instruction on involuntary manslaughter, it was not error to refuse to give one. See *Commonwealth* v. *Nardone*, 406 Mass. 123, 132 (1989) (judge should not instruct jury on lesser offense not supported by reasonable view of evidence).

5. *Defendant's claims of ineffective assistance of counsel.* In his motion for a new trial, the defendant claims that he was denied the effective assistance of counsel by his trial counsel's failure to present evidence that some third party, and not the defendant, was responsible for the murder, and by his failure to challenge the testimony of the Commonwealth's medical examiner regarding the approximate time of the victim's death. Because the defendant has been convicted of murder in the first degree, we consider his claim of ineffectiveness of counsel to determine whether the record reveals a substantial likelihood of a miscarriage of justice, as required under G. L. c. 278, § 33E, which is more favorable to a defendant than the constitutional standard for determining ineffectiveness of counsel. *Commonwealth* v. *Smith*, *ante* 476, 481 (2010). *Commonwealth* v. *Wright*, 411 Mass 678, 682 (1992). Thus, we consider the defendant's claim of failure by

trial counsel as part of our broader inquiry into "whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion." *Id.*

The defendant's unsubstantiated claim that defense counsel was ineffective for failing to present evidence of a third-party culprit is without merit. The claim rests on the bare assertions of the defendant's own affidavit in support of his motion that adequate investigation of a group of five named people would have proved that the killer was "someone other than me."[15] A defendant is entitled to present evidence that another person committed the crime where the evidence is of substantial probative value, is not too remote or speculative, and will not tend to confuse the jury by diverting their attention to collateral matters. *Commonwealth* v. *Phinney*, 446 Mass. 155, 163 (2006). The admission of third-party evidence that does not satisfy these criteria interferes with the fact finding of the jury and poses a risk of unfair prejudice to the Commonwealth, because it inevitably diverts juror attention away from the defendant on trial and onto third parties; in essence, unsubstantiated third-party evidence requires the Commonwealth to prove beyond a reasonable doubt that the third party did not commit the crime. *Commonwealth* v. *Silva-Santiago*, 453 Mass. 782, 801 (2009). Nothing in the defendant's affidavit and nothing he presents on appeal provides any substantive support for his underlying claim that someone else committed the murder. The judge therefore would properly have excluded reference to any third party at trial.[16] See *Commonwealth* v. *Phinney*, *supra.* In such circumstances, trial counsel's failure to develop and offer evidence of

---

[15]The potential suspects named by the defendant include the victim's father, the victim's mother, Latricia Carter, the teacher who had planned to clean classrooms with the victim on the day of the murder, and a former boy friend of the victim.

[16]In fact, the defendant's statement to police that the victim's former boy friend might have committed the murder was admitted in evidence, and defense counsel secured his availability to testify by subpoena. The judge indicated that he would permit the defendant to call the boy friend or to question police officers about their investigation of the boy friend or persons other than the defendant. The defense counsel's choice not to call him or to question officers about their investigation cannot, without more, support a claim of ineffective assistance of counsel. See *Commonwealth* v. *Boateng*, 438 Mass. 498, 509 (2003) (tactical and strategic decisions of trial counsel questioned on appeal

a third-party culprit could not have resulted in a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Blake*, 409 Mass. 146, 162 (1991) ("Defense counsel was not obliged to pursue all theoretical defenses, no matter how little basis in the evidence existed for them").

The defendant does no better in supporting his claim that his trial counsel's failure to challenge the testimony of Dr. Evans was error that likely influenced the jury's verdict. The defendant argues that, to impeach the credibility of Dr. Evans, his trial attorney should have introduced evidence of administrative failures in the medical examiner's office during the period in which Dr. Evans was acting chief. If defense counsel had pursued this line of questioning, and the Commonwealth had objected, it would not have been an abuse of discretion for the judge to have sustained the objection. If the judge had allowed the questioning, trial counsel might have raised doubts about Dr. Evans's performance as an administrator, but it is unlikely this would have materially influenced the jury's appraisal of the accuracy of Dr. Evans's rough estimate of the victim's time of death. Nor was the judge required to admit reports of administrative problems to support this sort of impeachment; extrinsic evidence on a collateral matter may be introduced at trial for the purposes of impeachment only in the discretion of the judge. *Commonwealth* v. *Chase*, 372 Mass. 736, 747 (1977). Trial counsel's failure to introduce this information therefore did not result in a substantial likelihood of a miscarriage of justice.

The defendant also claims that trial counsel should have introduced expert medical opinion to contradict Dr. Evans's estimate of the victim's time of death, because this might have shown that the victim was killed considerably later than twenty-four hours before her body was discovered, at a time when the defendant was already en route to North Carolina. While the defendant claims that his trial counsel should have developed this contradictory evidence by calling his own expert or, at a minimum, should have impeached Dr. Evans's testimony on

do not amount to ineffective assistance unless "manifestly unreasonable" when undertaken). Because the defendant in his motion for a new trial and on appeal provided no information indicating that the boy friend committed the murder, the defendant's trial counsel reasonably may have concluded that he could not connect the boy friend to the crime with anything other than sheer speculation.

cross-examination by introducing contrary opinion from learned treatises, he offers no affidavit from an expert witness providing a contrary opinion and points to no treatise that would do so. Nothing in the record on appeal indicates that a defense expert or learned treatise would have produced evidence favorable to the defendant or would have made a difference in the case in any way. We therefore cannot say that the defendant's trial counsel was ineffective for failing to retain his own expert or for failing to rebut Dr. Evans's testimony on cross-examination. See *Commonwealth* v. *Britto*, 433 Mass. 596, 606-607 (2001). "[I]n a case where ineffective assistance of counsel is charged, there ought to be some showing that better work might have accomplished something material for the defense." *Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 (1977).

Finally, the defendant assigns error to the judge's failure to hold an evidentiary hearing before ruling on his motion for a new trial. An evidentiary hearing is required if the motion and affidavits raise a substantial issue that would warrant a new trial. Mass. R. Crim. P. 30 (c) (3), as appearing in 435 Mass. 1501 (2001). The judge's conclusion that the defendant's motion and affidavit did not raise a substantial issue is entitled to substantial deference. See *Commonwealth* v. *Britto*, *supra* at 608. A defendant's submissions need not prove the factual basis of his motion in order to make an adequate showing of a substantial issue, but they must at least contain sufficient credible information to "cast doubt on" the issue. *Commonwealth* v. *Goodreau*, 442 Mass. 341, 348 (2004), quoting *Commonwealth* v. *Britto*, *supra*. For reasons we have discussed, the defendant's motion and affidavit were not adequate to cast doubt on the effectiveness of counsel's performance. See *Commonwealth* v. *Goodreau*, *supra* at 354 (when weighing adequacy of materials submitted in support of motion for new trial, "judge may take into account the suspicious failure to provide pertinent information from an expected and available source"). They do not, therefore, raise a substantial issue, and the judge did not err in deciding the motion on the basis of the affidavit and his familiarity with the trial. See *Commonwealth* v. *Britto*, *supra*.

6. *Review under G. L. c. 278, § 33E.* In addition to considering the defendant's specific claims on appeal, we have reviewed

the entire record pursuant to our duty under G. L. c. 278, § 33E. We address two issues not raised by the defendant on appeal.

a. *Admission of the ATM videotape.* The first issue concerns the admission in evidence of the videotape of the defendant's withdrawing one hundred dollars from the Cambridge Trust bank in Kendall Square at 1:30 P.M. on February 23. Prior to trial, the defendant had moved to suppress this videotape, claiming that it was the fruit of the unlawful warrantless search of the defendant's backpack on February 27, following his arrest. A State trooper and a Cambridge detective that day interviewed the defendant's brother at his home in North Carolina and asked whether the defendant had brought a bag with him. The defendant's brother retrieved a backpack from the room in his home where the defendant had been staying and consented to the search of the backpack. Among the items found in the backpack was a receipt from the Cambridge Trust ATM in Kendall Square indicating the withdrawal of funds on February 23. Based on this receipt, the assistant district attorney issued a subpoena on March 2 to Cambridge Trust for the videotape recording of this transaction.

The motion judge (who was also the trial judge) correctly concluded that the defendant had not abandoned the backpack by leaving it at his brother's home and that the defendant's brother did not have actual or apparent authority to consent to the search of the defendant's backpack. See *United States* v. *Robinson,* 999 F. Supp. 155, 162 (D. Mass. 1998); 4 W.R. LaFave, Search and Seizure § 8.3(f)-(g), at 166-171, 174-175, 181-182 (4th ed. 2004). See also *Commonwealth* v. *Porter P., ante* 254, 262-269 (2010). He therefore granted the defendant's motion to suppress the backpack and its contents, including the ATM receipt. The Commonwealth contended that, despite suppression of the ATM receipt, the videotape of the ATM transaction was still admissible because, even without the ATM receipt, police would inevitably have·discovered the location of the ATM in the course of their investigation of the murder. The judge found that, in early March, 2005, the victim's father provided police investigators a monthly bank statement from an account held jointly by the victim and the defendant at the East Cambridge Savings Bank that showed the defendant's withdrawal from the

Cambridge Trust ATM. The Commonwealth also argued that, based on the defendant's statement following his arrest (and prior to the search) that he had withdrawn one hundred dollars from an ATM machine in Kendall Square shortly after noon on February 23, police officers would have checked each of the nine ATM machines in Kendall Square in the course of their investigation and obtained the videotape through that investigative work.

The judge concluded that the police inevitably would have discovered the bank statement reflecting the February 23 ATM transaction, and denied the motion to suppress the written records of the ATM transaction. The judge also found, however, that because the Commonwealth presented no evidence regarding Cambridge Trust's policy on preserving ATM surveillance videotapes, it was unclear whether the bank videotape would still have been in existence by the time the detectives sought it after investigation of each of the Kendall Square ATM machines or after receiving the bank statement from the victim's father. He therefore reserved decision as to the admissibility of the videotape until evidence was presented or a stipulation reached concerning the bank's policy on preserving such videotapes.

The record does not reflect that further evidence was presented on this issue or a stipulation reached, or that a further hearing was held to resolve the matter. Yet at trial, the videotape was admitted in evidence without further ruling.[17] The defendant preserved his objection based on the earlier motion to suppress.

In these unusual circumstances, we review the admission of the videotape as if the judge had denied the defendant's motion to suppress, which in effect he did by admitting it in evidence, and determine whether the admission was error. Under art. 14 of the Massachusetts Declaration of Rights, the Commonwealth satisfies the inevitable discovery exception to the exclusionary rule if it proves by a preponderance of the evidence that "discovery by lawful means was certain as a practical matter." *Commonwealth* v. *O'Connor*, 406 Mass. 112, 117 (1989). The undisputed evidence at the hearing on the motion to suppress was that the defendant, when questioned following his arrest

---

[17]From the record of their discussion at sidebar, it appears that the prosecutor, defense counsel, and the judge all believed that the judge had earlier denied the motion to suppress the ATM videotape.

but prior to the search, informed the police officers about his ATM withdrawal from a bank in Kendall Square and also produced the East Cambridge Savings Bank card that he used to make the withdrawal.[18] It is undisputed as well that the East Cambridge Savings Bank statement records the address of the ATM from which the withdrawal was made. It would not have been clear error therefore for the judge to have found that it was "certain as a practical matter" that, without reliance on the ATM receipt, police investigators would promptly have learned through direct inquiry at the East Cambridge Savings Bank the address of the ATM from which the withdrawal was made, would have discerned from the address that the ATM was located at the Cambridge Trust bank in Kendall Square, and would have ensured that the videotape of the transaction was preserved until a subpoena issued. Therefore, the judge did not err in implicitly denying the defendant's motion to suppress the videotape.

b. *Admission of the DNA evidence.* In *Commonwealth* v. *Mattei*, 455 Mass. 840, 851-855 (2010) (*Mattei*), we held that DNA evidence that a particular individual could not be excluded as a potential contributor of the DNA at issue should not be admitted without accompanying statistical evidence as to the likelihood that the test could not exclude other individuals in a given population. Here, the forensic DNA analyst, without providing the statistical evidence required in *Mattei*, testified at trial that the defendant could not be excluded as a potential source of the male DNA detected from the fingernail scrapings taken from the victim's left hand.

In *Mattei*, standard DNA testing was used, and there was no dispute that the required statistical evidence existed. *Id.* at 851 n.26. Here, Y-STR testing was used, and Johnson testified that this method of testing cannot provide the same types of statistical calculations available with standard DNA testing. Instead, she compared the partial profile of thirteen markers from the fingernail scrapings with records kept by Orchid Cellmark of other Y chromosome profiles taken in earlier testing of male subjects. By this comparison, she determined that the partial

---

[18]The Cambridge detective who interviewed the defendant wrote down the bank card number and included it in his report.

profile recovered from the fingernail scrapings was not duplicated in any of the 3,561 male profiles on record at Orchid Cellmark. We need not decide whether our holding in *Mattei* applies to types of DNA testing that do not yield the statistical calculations available from standard DNA testing, or whether the comparison with the male profiles on record at Orchid Cellmark satisfied *Mattei*'s requirement of statistical evidence, because the evidence here was admitted without objection, and we conclude that, if its admission were error, it did not result in a substantial likelihood of a miscarriage of justice.

In *Mattei*, we determined that admission of "nonexclusion" results unaccompanied by statistical explanation of their meaning was prejudicial error and required a reversal of the defendant's convictions in large part because the challenged evidence was "crucial" to the Commonwealth's case: no other evidence placed the defendant inside the victim's apartment where the assault had occurred, and the prosecutor had consequently emphasized the importance of the nonexclusion result in her closing argument.[19] See *Mattei, supra* at 855-857. Here, by contrast, the nonexclusion evidence did not have comparable importance in the context of the Commonwealth's over-all case. While the defendant in *Mattei* was a stranger to the victim, the defendant here was the victim's husband; it was therefore of limited significance that small amounts of his DNA would be found beneath the fingernails of the victim's hand. Considering the limited probative value of the DNA evidence when considered in the context of the evidence as a whole, we are satisfied that admission of the nonexclusion evidence without qualifying statistical measures, if error, did not result in a substantial likelihood of a miscarriage of justice.

Having reviewed the entire record pursuant to our duty under G. L. c. 278, § 33E, we discern no error, considered alone or in conjunction with the defendant's claims of error, that produced

---

[19]In contrast to the instant case, the defendant objected to the admission of the challenged testimony in *Commonwealth* v. *Mattei*, 455 Mass. 840, 848 (2010). We thus considered his claim to determine if it constituted prejudicial error, a standard more generous to a defendant than the substantial likelihood of a miscarriage of justice standard applied in our review of unpreserved error under G. L. c. 278, § 33E. Compare *Commonwealth* v. *Flebotte*, 417 Mass. 348, 351, 353 (1994), with *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992).

a substantial likelihood of a miscarriage of justice. Nor, in view of the circumstances of this case, do we find any reason to reduce the murder verdict to a lesser degree of guilt.

*Judgment affirmed.*

*Order denying motion for a*
*new trial affirmed.*