# COMMONWEALTH *vs.* CALVIN CARNES, JR.

Suffolk. May 7, 2010. - September 9, 2010.

Present: MARSHALL, C.J., COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Evidence,* Admissions and confessions, Voluntariness of statement. *Practice, Criminal,* Admissions and confessions, Motion to suppress, Voluntariness of statement, Waiver, Instructions to jury, Exhibits, Argument by prosecutor, Fair trial, Deliberation of jury, Challenge to jurors, Judicial discretion, Mistrial, Capital case. *Constitutional Law,* Admissions and confessions, Waiver of constitutional rights, Fair trial. *Waiver. Joint Enterprise. Jury and Jurors. Deoxyribonucleic Acid.*

A Superior Court judge properly denied a criminal defendant's pretrial motion to suppress a statement that he made during an interview with police, where, although the police did not provide Miranda warnings to the defendant, the evidence clearly indicated that the defendant was not in custody at the time of the interview and that the defendant made the statement voluntarily. [818-820]

The judge hearing a criminal defendant's motion to suppress a statement that he made while in police custody on an unrelated charge correctly concluded that the defendant's waiver of his rights during that interrogation was knowing, intelligent, and voluntary. [822-823]

At the trial of indictments charging armed robbery and firearms violations, the evidence, which supported a reasonable inference that a third party had participated in the robbery and possessed the firearms with the defendant, warranted the judge's jury instruction on a theory of joint venture. [823-825]

At a criminal trial, the judge did not commit an abuse of discretion in admitting in evidence charts created by police that summarized telephone records and related witness testimony, where the underlying records had been admitted in evidence and the summaries accurately reflected those records. [825-826]

There was no merit to a criminal defendant's claim that the trial judge violated G. L. c. 234, § 34, by unlawfully prolonging deliberations after the jury (which was twice reconstituted) five times reported deadlock, where, at the time of each report of deadlock, the deliberations had not been due and thorough. [826-831]

There was no merit to a criminal defendant's claim that the trial judge's otherwise proper discharge of a juror became improper because the jurors were deliberating and there had been indication of deadlock, where the two statutes governing discharge of a juror, G. L. c. 234, § 26B, and G. L. c. 234A, § 39, specifically authorize discharge during deliberations; and where the defendant's contention that the judge dismissed the "one holdout juror" was speculation. [831-835]

Statement that, in future criminal proceedings, upon recognition that a juror was a participant in a prior legal proceeding, the prosecutor or defense counsel must inform the judge of the issue and obtain court approval to undertake further investigation of the juror or anyone involved with the subject matter. [835-836]

A criminal defendant failed to demonstrate that a trial judge had committed an abuse of discretion by failing to take remedial action in response to notes received from the jury during deliberations, where the notes did not disclose jury misconduct but rather reflected uncertainty from the jury regarding how to proceed with a hold-out juror. [836-839]

A criminal defendant failed to demonstrate that improper communications occurred between a juror and a court officer. [839]

A trial judge's empanelment procedure, whereby he excused without further inquiry members of the jury venire who responded affirmatively to certain questions that the judge considered almost always grounds for disqualification, although error, did not result in a substantial likelihood of a miscarriage of justice, where the defendant agreed to the procedure; where no prejudice was alleged or was apparent; and where this court could not speculate whether any of the dismissed jurors would have been seated. [839-841]

At a murder trial, the admission of testimony that the defendant could not be excluded as a potential source of certain mitochondrial deoxyribonucleic acid evidence, without qualifying statistical evidence, even if error, did not result in a substantial likelihood of a miscarriage of justice, where the evidence, in the context of the entire case, was of minimal significance. [841-843]

INDICTMENTS found and returned in the Superior Court Department on July 25, 2006.

Pretrial motions to suppress evidence were heard by *Charles J. Hely*, J., and the cases were tried before *Patrick F. Brady*, J., and *Margaret R. Hinkle*, J.

*Ellen J. Zucker* for the defendant.

*David D. McGowan*, Assistant District Attorney (*Joshua I. Wall*, Assistant District Attorney, with him) for the Commonwealth.

COWIN, J. Following the shooting of four men in the basement of a home in the Dorchester section of Boston on December 13, 2005, the defendant, Calvin Carnes, Jr., was convicted in the Superior Court of four counts of murder in the first degree on theories of deliberate premeditation and felony-murder. The victims were Edwin Duncan, Christopher Vieira, Jason Bachiller, and Jihad Chankhour. The defendant was convicted also of three counts of armed robbery; two counts of possession of a firearm without a firearm identification (F.I.D.) card; possession of a large capacity firearm; and larceny over $250.

On appeal, the defendant contends that the motion judge (who was not the trial judge) improperly denied his motions to suppress his statements to the police. With respect to the trial, he asserts that the evidence was insufficient to justify an instruction on joint venture on the armed robbery and firearms charges, and that the judge erred also by admitting in evidence charts summarizing telephone records and related testimony. With respect to the jury deliberations, the defendant alleges that another judge[1] acted improperly when she (a) dismissed a deliberating juror; (b) refused to declare that deliberations had been due and thorough, see G. L. c. 234, § 34; and (c) despite allegations of misconduct by jurors, refused to inquire of the jurors or declare a mistrial. We reject the defendant's claims, affirm his convictions, and, after review of the entire record pursuant to our responsibility under G. L. c. 278, § 33E, decline to exercise our power to grant extraordinary relief.

1. *Facts.* We summarize the facts the jury could have found. Other evidence is discussed in conjunction with the specific issues raised. On the evening of December 13, 2005, four young men were shot to death in the basement of the Bourneside Street home of the victim Duncan. Three of the four victims had gathered frequently at that location to listen to and record music and "hang out." The fourth, Chankhour, was not a frequent participant, but was present that night to repair some of the recording equipment. The group had no disputes or "problems" with any other groups of people, and its members got along well with each other. The young men were serious about their music and dedicated to it and to a music recording group they had formed. The defendant was friendly with some members of the group, but was not ordinarily present during the basement music sessions.

Two guns were often seen in the basement: an AK-47 assault rifle and a Mosberg pump action shotgun. These weapons were used for sound effects in recording music and also for the protection of expensive recording equipment. A "rule" of the group was that all weapons must "come into the basement unloaded" to avoid accidents. Prior to the homicides, one of the victims,

---

[1]During deliberations, the original trial judge became ill and was hospitalized for surgery. He was replaced by another judge. See Mass. R. Crim. P. 34 (*a*), as amended, 442 Mass. 1501 (2004).

Vieira, had purchased a nine millimeter Glock pistol with green "glow in the dark" sights; he displayed it to numerous people, treating it "like a toy." Two days before the murder, a person who was present early in the evening saw three guns in the basement: the AK-47 rifle, the shotgun, and Vieira's Glock pistol.

At about 9 P.M., Duncan's mother heard the sound of a gunshot and saw a male whom she did not recognize outside the house. He was standing near Vieira's black Ford Escort automobile, but did not look like Vieira. A neighbor heard two or three "pops" at about the same time and saw a dark automobile driving away from the Duncan home. Duncan's mother tried to reach her son on his cellular telephone; when she could not, she went to the basement and saw her son and one of the other victims lying on the floor "with blood everywhere." She telephoned 911 and the police responded immediately.

There was no sign of a forced entry or any physical struggle. All four victims died of gunshot wounds. Twelve shell casings were found inside the basement and one outside. They were all fired from the same weapon and all were consistent with being fired from a nine millimeter Glock pistol. On the day after the murder, witnesses saw the defendant with a Glock handgun with green sights. That day he also mentioned to some friends that he had an "AK" and a "pump" that he wanted to sell. Six months later, a nine millimeter Glock pistol with green sights was found in the possession of a person with no apparent relation to the defendant. Test firing determined that this was the firearm used in the shootings.

Because the dark automobile that was seen departing the Duncan home might have been Vieira's (based on Duncan's mother's testimony that she saw a person standing near Vieira's black automobile), there was speculation at first that Vieira might have been the killer. On the night of the murders, Tanya Diaz spoke by telephone with the defendant and said she had heard that Vieira had killed some people. The defendant replied, "No, 'Fat Boy' [Vieira's nickname] is dead."

A few days after the killings, Vieira's automobile was found on a street in Dorchester, unlocked and with the keys in the ignition. A fingerprint located on the exterior door frame of the

automobile was identified as the left index finger of the defendant. The automobile appeared to have been "wiped down" in places, including the driver's side door handle.

In February, 2006, the defendant admitted to his friends Maria Ortiz and Cynthia Small that he had committed the murders. He said, "It was an accident, they were [my] friends," and he began to cry. He explained that he had been in the basement and that everyone had been looking at the Glock firearm and, when he held it, he became nervous and shot someone. Then, according to Small, the defendant said that "everyone crowded around him . . . he just got more nervous and the gun went off and shot everyone." The defendant also told Small that if Robert Turner, his friend who was in the basement at the time of the shootings, had not run when he did, "he would have died, too." The defendant informed Ortiz that he had told the police that he had been with her the night of the murders and asked if she would corroborate his story. She did not respond. The defendant was arrested three months later on May 19, 2006.

The defendant testified that he had actually been with his friend, Turner, on the evening of December 13, 2005. Contrary to what he had told Ortiz, he testified that he was visiting with Katrina Hall at the time of the murders. He admitted that this alibi was different from the one he related to the police in two statements (see *infra*) in which he denied being in the basement of Duncan's home on the night of the homicides and denied killing his friends. He testified also that he did not tell Ortiz and Small that he had committed the murders.

In rebuttal, the Commonwealth called Katrina Hall, who had a specific memory of watching the news on the night of the murders and seeing a report about the shootings. She was with her sister that night and had no visitors. Later that month, the defendant did visit her and took out a black pistol and put it under her mattress. She chastised him because her daughter was there. He also mentioned that he had an AK-47 rifle for sale.

2. *Motions to suppress.* The defendant made two statements to the police, one on December 22, 2005, and another on February 10, 2006. The defendant contends that both his statements should have been suppressed. We consider each in turn.

a. *December statement.* While the defendant's argument with

respect to the December statement is not altogether clear, he appears to assert that he was subjected to a custodial interrogation that day and that, because he did not receive Miranda warnings, his statement must be suppressed. He maintains also that, apart from the requirement that Miranda warnings be provided, his statement was not made voluntarily because he was deprived of the information that was necessary to render the statement voluntary, i.e., that he was a suspect.

The motion judge found that the defendant was not in custody at the time of the December statement, and thus no Miranda warnings were required. See *Commonwealth* v. *Groome*, 435 Mass. 201, 211-212 (2001), citing *Commonwealth* v. *Morse*, 427 Mass. 117, 121-127 (1998), and *Commonwealth* v. *Bryant*, 390 Mass. 729, 737 (1984). The police are not required to inform the defendant of his status as a suspect. See *Commonwealth* v. *Groome, supra* at 212 n.13. See also *Commonwealth* v. *Raymond*, 424 Mass. 382, 393 (1997) ("Neither the subject matter of the questioning nor the defendant's status as a suspect has any bearing on whether the defendant understands that he need not answer the questions"). Accordingly, the only question before us with respect to this statement is whether the judge's determination that the defendant was not in custody is supported by the evidence. We conclude that the finding is warranted.

i. *Facts*. We summarize the judge's comprehensive findings. A few days before the December 22, 2005, interview, Detective Russell Grant and Sergeant Detective James Wyse of the Boston police department told the defendant's father that they wanted to speak with the defendant. (The defendant was nineteen at that time.) The defendant's father indicated to the defendant that he should speak with the police and cooperate with them. The defendant telephoned the detectives and agreed to meet them at a duplex house that was owned by one of his parents. The defendant's father, a contractor, was working on the house and suggested it as a convenient location for the gathering.

The two detectives met with the defendant and his father at about 11:15 A.M. on December 22. The defendant's baby daughter was also present. The detectives introduced themselves and explained that they wished to speak with the defendant about the Bourneside Street homicides and that they were interviewing

friends and family of the victims. The defendant and his father were both aware of the killings. The defendant agreed to the questioning.

The defendant's father and the defendant's baby were present for the entire interview. The men sat at a table. The defendant was first queried for about twenty minutes without an electronic recording. The police then asked the defendant if he would agree to an audiotaped interview. The defendant agreed and the taped interrogation lasted about thirty-six minutes. During the taped segment, the defendant received a short telephone call from his baby's mother. The tape recording was turned off while the defendant spoke on the telephone.

The defendant described his relationships to the victims and told the police that he had spoken with Vieira on the night of the murders; they had planned to meet at the basement studio to "chill[], smok[e] and hang[] out," but he changed his plans and, instead of going to the studio, he met Maria Ortiz and was with her until 11 P.M. Then he took a bus to his apartment.

The defendant made essentially the same statements both in the interview prior to taping and in the recorded session. At the conclusion of the taped questioning, the defendant was asked if he felt uncomfortable or pressured or coerced. He responded in the negative and expressed interest in helping the police. Upon inquiry, the defendant's father stated that he was content with the interview and that it had been conducted very professionally.

The judge found that the defendant was not in custody at the time of the interview. Accordingly, he ruled that the police were not required to provide the Miranda warnings and that there was no meaningful question whether the defendant voluntarily waived any rights. The judge ruled as well that the police need not inform the defendant that he was a suspect. The judge found ultimately that the defendant's statements (both recorded and unrecorded) were made voluntarily.

ii. *Discussion.* In reviewing a judge's denial of a motion to suppress, we accept the judge's findings of fact and will not disturb them absent clear error. See *Commonwealth* v. *Gomes,* 453 Mass. 506, 508-509 (2009); *Commonwealth* v. *Jones,* 375 Mass. 349, 354 (1978). We determine independently the correctness of the judge's application of constitutional principles to

the facts found. See *Commonwealth* v. *Mello*, 420 Mass. 375, 381 n.8 (1995). Questions of credibility are the province of the judge who had the opportunity to observe the witnesses. See *Commonwealth* v. *Martin*, 447 Mass. 274, 280 (2006).

Miranda warnings are required only when an individual is subjected to custodial interrogation. See *Commonwealth* v. *Morse*, 427 Mass. 117, 122 (1998). To determine whether a defendant is in custody we generally consider four factors: "(1) the place of the interrogation; (2) whether the officers have conveyed to the person being questioned any belief or opinion that that person is a suspect; (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the person being interviewed; and (4) whether, at the time the incriminating statement was made, the person was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave, as evidenced by whether the interview terminated with an arrest" (*Groome* factors). *Commonwealth* v. *Groome, supra* at 211-212, citing *Commonwealth* v. *Morse, supra* at 121-127, and *Commonwealth* v. *Bryant, supra* at 737.

Consideration of the *Groome* factors leads to the clear conclusion that the defendant was not in custody at the time of the interview. He was interviewed at about noon in a house owned by his family. He was accompanied by his father and baby daughter. The interview was conducted at a table with the men seated at it and was informal and cordial. The entire questioning (both the untaped and taped segments) lasted only about one hour and fifteen minutes. The defendant received a telephone call during the interview. At the conclusion of the interview, both the defendant and his father expressed satisfaction with the manner in which it had been conducted. The officers never conveyed to the defendant any suggestion that he was a suspect. The defendant was free to leave the interview and was not arrested at its conclusion.

A statement is voluntary if, in the totality of the circumstances surrounding the making of the statement, the defendant's will is not overborne, so that the statement is the result of a free and voluntary act. See *Commonwealth* v. *Burton*, 450 Mass. 55, 61 (2007); *Commonwealth* v. *Sneed*, 440 Mass. 216, 222 (2003).

The judge's finding that the defendant's statement was made voluntarily is also supported by the evidence. The defendant was nineteen at the time of the interview and living in his own apartment. He was not under the influence of alcohol or drugs. Although his father had said that he should cooperate with the police, this instruction did not deprive the defendant of the ability to make a voluntary choice on the subject. The defendant spoke freely with the police, giving narrative answers and an exculpatory account of his actions on the night of the murders. There was no coercive conduct or atmosphere during the interview and the defendant's will was not overborne. Accordingly, the judge was correct in his conclusion that no Miranda warnings were required and that the police did not need to inform the defendant that he was a suspect.

b. *February statement.* The defendant claims that his statement of February 10, 2006, was obtained in violation of his rights under the Fifth Amendment to the United States Constitution and that any waiver of rights was not knowing and voluntary because he was under arrest for the crime of trespassing, but was questioned as the main suspect in the homicides, and was not given his Miranda warnings "concerning the Bourneside murders."

i. *Facts.* We again summarize the detailed findings of the judge. On February 10, 2006, before any arrests had been made for the Bourneside Street homicides, the defendant was arrested at about 11 A.M. for trespassing and breaking and entering. The defendant was transported first to the police station for the area of Boston in which he had been arrested, and then to the Boston police homicide unit. The defendant was given an opportunity to make a telephone call, and he did so. The interview commenced at about 12:50 P.M.; Detectives Grant and Wyse were present. Detective Grant conducted the interview. The defendant was told that he had been arrested for a breaking and entering that had occurred that day and that he was being charged with that crime. Detective Grant said that he wanted to "talk with [the defendant] about — some more about [his] friends that were murdered up on Bourneside Street." The detective said also, "you've been arrested and . . . you're in custody now, and I want you to understand, you're in custody for that arrest,

for that B&E, you're not being charged with anything to do with the homicide." The defendant was then provided a consent form for an audio recording and informed that he could choose whether to have the interview recorded. He read and signed the form, agreeing to the electronic recording.

The detective explained to the defendant that he must read the defendant the Miranda warnings because he was in custody on the breaking and entering charges and the detective wanted to be certain that the defendant understood his rights. He repeated that the defendant was not being charged with the homicide. A Miranda warning form was shown to the defendant. It contained the four Miranda warnings plus a statement that, if the defendant decided to answer questions without a lawyer present, he still had the right to stop answering at any time until he spoke to a lawyer. The detective read each of the warnings; the defendant read them and said he understood each one and initialed the form after each warning.

The detective repeated that the police wanted to speak with him about his friends who were murdered on Bourneside Street. He asked the defendant to state where he was and what he was doing on the night of the killings. The defendant once more provided an exculpatory account of his actions that night, stating that "Fat Boy" had called him at about 7 P.M. and arranged to meet him at Bourneside Street to "chill," smoke and drink. Again, the defendant said that he had changed his mind and that he and his friend "Rob" (Turner) went instead to the apartment of Ortiz and Small and later to the Fairlawn housing project. The defendant agreed with the detective that his account was essentially the same as it had been at the prior interview.

Detective Grant informed the defendant that he had just interviewed Turner and that Turner had provided a different account of the night of the killings, saying that he and the defendant separated after leaving the women's apartment. The defendant said that he did not know why Turner would say this; Detective Wyse urged the defendant to tell the truth. The defendant insisted that he was telling the truth and that he had not been on Bourneside Street on the night in question. The interview lasted about one hour, ending about 1:50 P.M., and the defendant was not arrested for the murders at that time.

The judge concluded that the defendant was in custody during this interview, that he received "complete" Miranda warnings at the outset of the questioning, and that the defendant had knowingly, intelligently, and voluntarily waived his Miranda rights.[2]

ii. *Discussion.* A waiver's validity is determined in light of the "totality of the circumstances," which includes, "among other things, the defendant's age, education, intelligence, physical and mental stability, and experience with and in the criminal justice system." *Commonwealth* v. *Anderson,* 445 Mass. 195, 203 (2005). "In order for a waiver to be 'knowing' and 'intelligent,' the defendant must understand 'the [Miranda] warnings themselves,' but does not need to understand or appreciate the tactical or strategic consequences of waiving Miranda rights." *Commonwealth* v. *Hilton,* 443 Mass. 597, 606 (2005), quoting *Commonwealth* v. *Raymond,* 424 Mass. 382, 393 (1997).

The defendant's position is that he could not and did not validly waive his Miranda rights because he was not told that he was the prime suspect in the killings when he was subjected to custodial interrogation on February 10, 2006. The judge's determination that the defendant's waiver of his rights was knowing, intelligent, and voluntary is supported by the evidence; accordingly, the waiver was valid and the defendant's statements were admissible.

As the judge found, the defendant was not impaired in any way. The defendant read fluently and spoke well. The tape recording of the session indicates that the defendant read the Miranda warnings and the waiver language aloud. He initialed each warning and signed the waiver. Based on the defendant's testimony at the hearing on the motions to suppress, as well as his statements during the tape-recorded interview, the judge could permissibly find that the defendant was of sufficient intelligence to understand and waive his rights.

The defendant understood that he had the right to remain silent and to consult with an attorney. He wished to give the police his exculpatory account of his whereabouts on the night

---

[2]The judge determined also that there was no impropriety in transporting the defendant to the homicide unit; that this had not caused any "excessive" delay; and that the defendant's right to a prompt arraignment was not violated. See *Commonwealth* v. *Rosario,* 422 Mass. 48, 56 (1996).

of the murders. As the judge said, the defendant believed that "the officers would believe him . . . [and] that telling this version would help him." The judge also found that the defendant spoke with the police freely and voluntarily. This finding is supported. The evidence indicates that the police behavior was not coercive. The fact that the police told the defendant that "the truth would come out," that they did not believe him, and that Turner had provided a different story did not render the waiver involuntary. Contrary to the defendant's argument, the law does not require that the police inform the defendant whether he is a suspect. See *Commonwealth* v. *Groome*, 435 Mass. 201, 212 n.13 (2001).

3. *Joint venture instruction.* The defendant contends that, because there was insufficient evidence to support a finding of a joint venture, the judge erred by instructing on that theory.[3] The defendant did not object to the instruction.

The judge limited the jury's consideration of the joint venture theory to the three charges of armed robbery and the two charges of possession of a shotgun and possession of an AK-47 rifle.[4] A joint venturer is "one who aids, commands, counsels, or encourages commission of a crime while sharing with the principal the mental state required for the crime." *Commonwealth* v. *Soares*, 377 Mass. 461, 470, cert. denied, 444 U.S. 881 (1979). The defendant's intent may be inferred from his knowledge of the circumstances and participation in the crime. *Id.*[5] It was the Commonwealth's theory that the defendant shot the victims; that he and Turner then stole the Glock pistol, the shotgun, and the assault rifle; and that together they then wrapped the assault rifle in a trash bag secured with duct tape and stored the weapons for at least some time in Cynthia Small's house.

As stated, the defendant told his friends Ortiz and Small that Turner was present at the Bourneside Street basement on the night of the killings and that, if Turner had not run from the

_____

[3]The defendant does not challenge the substance of the charge on joint venture.

[4]The judge did not instruct on joint venture as to the Glock weapon.

[5]Since the trial of this case, we have articulated the concept as "aiding and abetting" rather than as "joint venture." See *Commonwealth* v. *Zanetti*, 454 Mass. 449, 466-468 (2009). The new language is to be used for trials that commenced after the issuance of the rescript in that case.

scene, he would have been shot as well. There was also testimony that, two days before the homicides, there were three weapons in the Bourneside Street basement: an AK-47 assault rifle, a shotgun, and the nine millimeter Glock pistol with shiny green sights. In addition, one of the defendant's roommates remembered that one night in December, before Christmas, the defendant and Turner came to the apartment, obtained trash bags and duct tape, and left with a black trash bag wrapped in gray duct tape. Small, a friend of both the defendant and Turner, recalled that on the night of the murders the defendant left with her a black trash bag package with duct tape around it. Turner, who accompanied the defendant, left a second package. At approximately 1 A.M., after seeing news of the four murders in a basement, Small looked in one of the packages and saw a weapon. She called the defendant's cellular telephone and asked if he had just killed some people. The defendant replied, "Don't call my phone asking questions like that."

That afternoon, the defendant, Turner, Ortiz, and Small were at Small's house and the defendant was in possession of a handgun. He also mentioned an "AK" and a "pump" that he wanted to sell to "put money in his pocket." Turner agreed that the defendant should sell the weapons. That evening, the defendant and Turner visited Turner's friend, Tanya Diaz. The defendant took a handgun from his waistband and asked Diaz to hold it for him. The defendant asked Diaz for rubbing alcohol and a rag. He poured alcohol on the rag and began wiping the weapon all over. Turner looked at the handgun and said, "That shit is nice, isn't it?" Diaz described the weapon as black with "little green lights on the top." The defendant put the handgun in his waist and he and Turner left.

Katrina Hall testified that later in December (sometime after the night of the murders), the defendant and Turner were at her house. The defendant asked a friend of Hall's if he knew anyone who needed some weapons because he had an AK-47 rifle and "all types." Turner looked at the defendant and said, "Man, what are you doing? Shut up."

Thus, the jury reasonably could infer that the defendant would not have displayed the weapons so freely in Turner's presence had Turner not participated in the robbery. Because the evidence

supported a reasonable inference that Turner participated in the robberies and possessed the shotgun and the AK-47 rifle with the defendant, the evidence warranted a joint venture instruction.

4. *Admission of charts.* The defendant argues that charts created by the Boston police summarizing telephone records and witness testimony regarding the times of the calls and the makers of the calls should not have been admitted in evidence. The underlying records concerning the defendant's cellular telephone calls for the relevant period were admitted without objection. The defendant did object when the Commonwealth moved to introduce the summary charts; the judge proposed a limiting instruction, which the defendant indicated did not satisfy his concerns, but that he would "accept." The judge gave the instruction which is reprinted in the margin.[6] The defendant later indicated that he was satisfied with the exhibits presented to the jury. We need not decide whether an objection was properly preserved, as we discern no abuse of discretion in the judge's ruling.

Summaries of testimony are admissible, provided that the underlying records have been admitted in evidence and that the summaries accurately reflect the records. See *Commonwealth* v. *Guy*, 454 Mass. 440, 446 n.5 (2009); *Welch* v. *Keene Corp.*, 31 Mass. App. Ct. 157, 165-166 (1991); Mass. G. Evid. § 1006 (2010). See also *United States* v. *Dorta*, 783 F.2d 1179, 1182-

---

[6]"Regarding the charts with telephone numbers, the information contained therein, the reason that counsel and I were having an extended discussion is that technically and strictly speaking these large blow-up charts that Mr. Wall is offering into evidence are hearsay. That is, they're compilations admittedly [made] by Detective Torres outside of court, based on a number of things. Based on the, according to his testimony, which is up to you to credit or not depending on how you view it, based on the Verizon records as well as verbal testimony from other witnesses and perhaps other sources such as telephone books and Internet sources. To the extent that there is a difference between Detective Torres's compilation and the underlying records, which may come out as the testimony goes further, you should keep in mind that he simply claims to be making a compilation. He's not the original maker of business records. And to the extent that that is of importance to evaluation of any particular point in this case, you should always keep that in mind, that these are simply compilations and I am essentially admitting them because it probably would be of assistance to the jury to have some form of compilation made of the voluminous business records submitted by Verizon as well as testimony and other references."

1183 (4th Cir.), cert. denied, 477 U.S. 905 (1986) (no abuse of discretion where charts summarized evidence already admitted). Here, the information on the charts had been presented through a representative of Verizon Wireless (Verizon), a detective, and other civilian witnesses. The Verizon witness explained that the information on the charts "match[ed] the raw data." Other witnesses identified the telephone numbers on the charts. In addition, the judge cautioned the jury to evaluate the evidence independently.

5. *Jury deliberations.* The defendant states that the judge did not adhere to the requirements of G. L. c. 234, § 34, and that violation of that statute also implicates his right under the Sixth Amendment to the United States Constitution to a fair and impartial jury. Specifically, the defendant maintains that the judge violated the statute by unlawfully prolonging deliberations after the jury five times reported deadlock. G. L. c. 234, § 34, provides:

> "If a jury, after due and thorough deliberation, return to court without having agreed on a verdict, the court may state anew the evidence or any part thereof, explain to them anew the law applicable to the case and send them out for further deliberation; but if they return a second time without having agreed on a verdict, they shall not be sent out again without their own consent, unless they ask from the court some further explanation of the law."

The decision as to when the jury's deliberations have been "due and thorough" lies within the discretion of the judge, see *Commonwealth* v. *Haley,* 413 Mass. 770, 779 (1992), and requires evaluation of the "complexity of the case, the extent of evidentiary conflict on material issues, and the total length of time the jury [have] spent attempting to resolve those conflicts." *Commonwealth* v. *Winbush,* 14 Mass. App. Ct. 680, 682 (1982), citing *Thames* v. *Commonwealth,* 365 Mass. 477 (1974). See *Commonwealth* v. *Semedo,* 456 Mass. 1, 21 (2010).

Jury deliberations began on Friday, June 6, 2008. On Thursday, June 12, after the jurors were sent out to resume their deliberations, the judge informed counsel that she had just learned that two jurors had airline tickets to leave the country. One juror was scheduled to depart that night to meet with her family in

Jordan[7]; a second was leaving on Saturday to attend her father-in-law's funeral in Barbados on Monday. The judge indicated that no action was necessary at that time and that deliberations would continue.

At 3:20 P.M., the jury wrote that they were deadlocked. The judge discussed the issue with counsel at 4:15 P.M.[8] The judge indicated that, because at least one juror may have to be discharged, the jury might be newly constituted before further deliberations. Thus, there was no purpose in giving a *"Tuey-Rodriquez* charge," an instruction given when jurors report deadlock after "due and thorough deliberation." The instruction is designed to urge the jury to reach a verdict by giving more serious consideration to opposing points of view. See *Commonwealth* v. *Rodriquez*, 364 Mass. 87, 98-101 (1973), modifying *Commonwealth* v. *Tuey*, 8 Cush. 1, 2-4 (1851). Neither party objected. A voir dire of the two jurors was conducted and they were both discharged.

The next morning, Friday, June 13, two alternates were seated and the jury were instructed to begin deliberations anew. The judge specifically told them that starting deliberations anew meant that "you start from the beginning as if there had not been deliberations up until this point." She then asked; "Is that clear to everybody? You start from the beginning in your deliberations." The newly constituted jury began deliberations at 10 A.M. At 3:50 P.M., the jury wrote to the judge indicating that they were deadlocked. The judge found that deliberations had not been "due and thorough" because the jury had been newly reconstituted only that morning. She proposed sending the jury home for the weekend. Both counsel agreed and the judge did so.

On Monday, June 16, at 9:40 A.M., before the jury had resumed

---

[7]Although the judge informed the jurors at the outset of empanelment that the trial was expected to last one month, the record does not indicate that the juror with an airline ticket for Jordan informed the judge of her later unavailability. She stated in her subsequent voir dire before the replacement judge that she had informed a court officer of her travel plans when she was selected as a juror. There is no record indication whether the court officer passed this information to the judge.

[8]Because the judge had so recently assumed charge of the trial, see note 1, *supra*, she was presiding over a trial of her own while managing the jury in the present case.

deliberations, the judge reported receiving another note from the jury. It read: "The addition of [two] new jurors has not changed the position of the jury. At this point, all but one juror is in agreement and there is no hope of that one juror changing their mind. She began to feel verbally abused on Friday and is very upset." The judge indicated that she would acknowledge the jury communication, but would have the jury continue to deliberate. Again, neither counsel objected.

Later that day, at 11:30 A.M., the judge received an additional communication from the jury. This note stated: "One juror had expressed concern that continued heated debate would cause a [flare up] of her medical condition. This type of heated debate would be required to make progress in the deliberative process. We are still at a deadlock." With the agreement of the parties, the judge conducted a voir dire of this juror (juror no. 15). The juror, a nurse, indicated that she had an autoimmune disorder, but could continue with deliberations. She stated also that she had been unaware that the note had been sent. This note was not treated by any of the trial participants as a communication of deadlock that required action by the court.

After juror no. 15 returned to the jury, the prosecutor disclosed to the judge that he had learned that this juror had made material misrepresentations in her responses to the juror questionnaire. The judge declined to take any action on that information, and the prosecutor sought relief from a single justice of this court pursuant to G. L. c. 211, § 3. See part 6, *infra*.

At 4 P.M., the judge received another note which read: "Jury has not made any progress toward consensus. We are still firmly deadlocked 11:1. The jury is very frustrated." Due to the late hour, the judge denied the defendant's request for a *Tuey-Rodriquez* charge; instead, she dismissed the jurors for the day, explaining that she would provide additional guidance the following morning.

On the next day, Tuesday, June 17, defense counsel requested that the judge declare a deadlock or a mistrial. The judge did not grant the request. Rather, as a result of the information the prosecutor had revealed to the court on the previous day and a ruling by a single justice of this court on the petition pursuant

to G. L. c. 211, § 3, a voir dire of juror no. 15 was conducted. The voir dire took place prior to the resumption of jury deliberations and resulted in the discharge of juror no. 15 for cause. An alternate juror was selected. Defense counsel objected to the removal of the juror and to the resumption of jury deliberations and requested that the judge declare either a deadlock or a mistrial. The judge stated that she had not found the jury to be deadlocked, thereby implicitly denying the defendant's motions. At approximately 12:05 P.M., the judge instructed the jury to begin their deliberations anew. On the following day, Wednesday, June 18, the jury returned their verdicts at approximately 2:40 P.M.

The defendant maintains that the judge "forced" a guilty verdict by ordering the jury to return to deliberations after five reports of deadlock rather than giving a *Tuey-Rodriquez* instruction. This is significant because, had the jury been so instructed at one of their reports of deadlock, another report of deadlock would have precluded the judge from requiring further deliberation without the jury's consent. See G. L. c. 234, § 34.

The short answer to this contention is that there never was a jury whose deliberations had been "due and thorough" thereby requiring the giving of a *Tuey-Rodriquez* instruction. When the judge received the first report of deadlock, late in the day on June 12, she and counsel were aware that two of the deliberating jurors had travel plans that would be likely to force a change in the jury's composition. The two jurors were removed without objection by defense counsel. Because no further deliberations were to be conducted by the jury as previously constituted, there was no reason to give a *Tuey-Rodriquez* charge at that time. Indeed, such an instruction would have been inappropriate. The next morning, two alternates were added to the jury and a new jury began deliberations and were instructed forcefully and precisely to "start from the beginning." See *Commonwealth* v. *Haywood*, 377 Mass. 755, 770 n.15 (1979). See also *Commonwealth* v. *Olavarria*, 71 Mass. App. Ct. 612, 618-622 (2008) (no error in not declaring mistrial when original jury twice claimed they were at impasse; discharge of juror and replacement with new juror resulted in new jury, rendering G. L. c. 234, § 34, no longer applicable).

The second jury reported that they could not reach a verdict

on June 13 at 3:50 P.M., six hours after they had begun deliberations. When the judge stated that deliberations at that point had not been "due and thorough," the defendant did not object and did not request a *Tuey-Rodriquez* charge. The judge acted within her discretion in determining that the deliberations of the second jury had not been "due and thorough." Over sixty witnesses testified during three weeks of trial. There were more than 200 exhibits. Eleven indictments were at issue, many of them dependent upon separate and distinct evidence. It was clearly appropriate for the judge to determine "that deliberation had not yet been 'due and thorough.' " See *Commonwealth* v. *Valliere,* 366 Mass. 479, 496 (1974) (in complex trial with seventy-eight witnesses and over 250 exhibits, judge could permissibly determine that deliberations had not been "due and thorough" after thirteen hours). See also *Commonwealth* v. *Semedo,* 456 Mass. 1, 20-21 (2010) (within judge's discretion to determine that jury that had deliberated "at most nine hours and perhaps less" had not reached point of due and thorough deliberations).

The third report of deadlock came at 9:40 A.M. on Monday, June 16, before deliberations had resumed. The judge elected to treat this communication as a reiteration of the note received the previous Friday at the end of the day. She instructed the jurors that she was "mindful" of their note and that they were to continue their deliberations. There was no objection by defense counsel. The judge's course of action was within her discretion. No further deliberations had occurred since the time she had determined that the deliberations were not "due and thorough."

The fourth report of deadlock came at 4 P.M. on the same day and indicated that the jury were deadlocked "11:1."[9] Because of the hour, the judge denied the defendant's request to give a *Tuey-Rodriquez* charge and dismissed the jury for the day. The

---

[9]The defendant maintains that the fourth report of deadlock was the communication sent at 11:30 A.M. on June 16. As stated, we do not treat that note as one indicating deadlock. Its purpose was to notify the court of the condition of juror no. 15. Even if we were to consider the note as one announcing deadlock, the judge implicitly concluded that, at that time, only two hours after deliberations had resumed (and after eight hours total of deliberations), deliberations had still not been due and thorough. Such a decision is within her discretion. See, e.g., *Commonwealth* v. *Semedo,* 456 Mass. 1, 20-21 (2010); *Commonwealth* v. *Valliere,* 366 Mass. 479, 496 (1974).

next morning, before deliberations had begun, the voir dire of
juror no. 15 was conducted and that juror was discharged for
cause. An alternate was selected and the jury were instructed
once more to begin deliberations anew. The judge proceeded
properly. There was no reason to give a *Tuey-Rodriquez* charge;
a new juror had joined the jury and deliberations began anew.

6. *Discharge of deliberating juror.* The defendant alleges that
the judge discharged the only "hold-out" juror during jury
deliberations in violation of his right to a fair trial under the
Sixth Amendment to the United States Constitution and the
provisions of G. L. c. 234, § 26B, and G. L. c. 234A, § 39. The
judge discharged the juror after a voir dire and after reciting her
findings of fact justifying the discharge. The defendant does not
contend that the judge's findings are erroneous. Rather, he claims
that it was error to remove the "one hold-out" juror while the
jurors were deliberating, particularly after the jury had com-
municated deadlock of eleven to one. He alleges also that the
timing of the Commonwealth's inquiry into the juror's back-
ground was improper. Essentially, the defendant is arguing that,
even if information had come to the judge's attention that justi-
fied removal of the juror, the judge lost her authority to remove
the juror either because the jury was already deliberating or
because there was indication that this juror was the sole hold-out.

General Laws c. 234, § 26B, provides, in relevant part: "If,
at any time after the final submission of the case by the court to
the jury and before the jury has agreed on a verdict, a juror
dies, or becomes ill, or is unable to perform his duty for any
other good cause shown to the court, the court may order him
to be discharged . . . ." General Laws c. 234A, § 39, refines
the authority to discharge by providing in relevant part: "The
court shall have authority to excuse and discharge a juror
participating in jury deliberations after a hearing only upon a
finding of an emergency or other compelling reason." Pursuant
to these statutes, numerous cases have upheld a judge's deter-
mination to discharge a deliberating juror, including specifically
for failure to disclose a criminal record. See *Commonwealth* v.
*Cousin,* 449 Mass. 809, 821-822 (2007), and cases cited.

Context regarding the situation that resulted in the removal of
the juror is helpful in understanding the judge's action, the

defendant's contentions, and our resolution of the matter. Our summary recitation is derived from the record.

The standard juror questionnaire was completed by all potential jurors. It contained questions concerning the juror's "experience with the law," including whether the juror or anyone in the juror's household or family had ever been arrested, charged with a crime, or served with a court order; been a witness in a civil or criminal case; been a crime victim; or been seated on a jury. The questionnaire form was signed by the juror below a statement that indicated that the information supplied on the form was true and complete "to the best of my knowledge." The statement above the signature line explained also that a wilful misrepresentation or omission of a material fact on the form was a crime and set forth the penalty for the offense.

In addition, during empanelment, the trial judge devoted two and one-half pages of transcript to explaining the section concerning the juror's "experience with the law." He emphasized that some people do not answer the questions accurately, perhaps because they are embarrassed about a crime in which they were involved or may have forgotten a minor offense that occurred a long time ago. He gave examples of such situations. He stated that every juror's record was checked on the computer. When he finished, the judge asked jurors to raise their hands if they had not "fully, accurately and completely answered the questions contained in the section . . . entitled, 'Your experience with the law,' " so that they could have an opportunity to "add to the detail as . . . necessary." During the course of empanelment, nineteen jurors raised their hands in response to the judge's exhortation. The Commonwealth checked the criminal offender record information (CORI) of all jurors before empanelment was completed and timely shared this information with defense counsel. See *Commonwealth* v. *Cousin, supra* at 819.[10]

As indicated in part 5, *supra*, during jury deliberations, on Monday, June 16, 2008, the prosecutor brought to the judge's

[10]In this case, the Commonwealth obtained, but did not "look at," the criminal offender record information for all members of the venire before the start of empanelment. Only the records of those jurors deemed indifferent were reviewed by the Commonwealth and provided to defense counsel. See, in this regard, *Commonwealth* v. *Hampton, ante* 152, 169-171 (2010).

attention the fact that, after the close of court on the previous Friday, he had learned that a juror had made material misrepresentations on her juror questionnaire. The new information concerned a criminal record of the juror's husband. The judge declined to make inquiry of the juror concerning the criminal record of someone other than that juror. The Commonwealth sought an order from a single justice of this court, see G. L. c. 211, § 3, requiring the judge to conduct a voir dire of the juror or discharge the juror for good cause. On the following day, June 17, a single justice denied the Commonwealth's petition, but stated that the holding in the case of *Commonwealth* v. *Cousin, supra,* needed no clarification and that "[t]he judge may conduct a hearing to determine the timing of the prosecutor's inquiry into the accuracy of the juror's questionnaire, and the judge has discretion to remove the juror."

Accordingly, on that day, June 17, the judge questioned the prosecutor under oath regarding the circumstances in which he had learned of the misstatements. The prosecutor explained that on Friday, June 13, after the court day concluded, he learned that a victim witness advocate in the district attorney's office (not assigned to this case) had seen the jurors in the instant case and had recognized juror no. 15 as a woman she had assisted the previous year in the Dorchester Division of the Boston Municipal Court Department in a domestic violence case against her husband. Because that information had not been disclosed on the questionnaire, the prosecutor directed a detective of the Boston police department to confirm the information by reviewing Boston police department records. Once the existence of the domestic violence action against the juror's husband was confirmed, the prosecutor authorized a check of the CORI of the juror's husband. The prosecutor obtained information regarding the husband's criminal record after the jurors had resumed deliberations Monday morning.[11]

The judge conducted a voir dire of the juror and made findings as follows. The juror's first language is English; she has an

---

[11]The information the prosecutor obtained was that the juror's husband had a recent Federal conviction. The prosecutor informed the judge on the previous day of the existence of the Federal conviction. The prosecutor did not mention the fact of the conviction in his testimony.

associate's degree in education in Ghana and a second associate's degree, a nursing degree, from a two-year college in the United States. Therefore, there was nothing to suggest that the juror did not understand the questionnaire. The juror questionnaire is precise and clear in its inquiries (in contrast to the questionnaire in use at the time of *Commonwealth* v. *Cousin, supra*); in addition, the questioning by the judge during empanelment "put an additional burden" on the prospective jurors to determine whether any of them had not answered the questionnaire accurately. Nevertheless, the judge found, juror no. 15 "failed to inform us" that she had "sought a court order"; had been a victim of a crime; had been a witness in "the sense that she had sought numerous restraining orders"; and had filed numerous lawsuits herself.[12] She also failed to state that her husband had been arrested, served with a court order, and charged with and convicted of a crime, and that she had been a witness in her husband's criminal case. Indeed, the judge found that the only question juror no. 15 answered affirmatively in the section was that she had served as a juror.

The judge concluded that the juror's explanation for her failure to disclose was not credible and that, given her education and training, she had intentionally misled the court and the parties. This was not a case of one inaccuracy, the judge found; rather, the inaccuracies occurred in virtually all questions regarding law enforcement, but for the one about prior jury service. The judge found also that had the information about the juror been known during empanelment, the Commonwealth would have exercised a peremptory challenge to remove her.[13] The judge concluded that there was a compelling reason under G. L. c. 234A, § 39, to discharge the juror and good cause for her discharge under G. L. c. 234, § 26B.

As stated, the defendant does not maintain that the judge's findings are erroneous. Rather, the defendant contends that the timing of the inquiry was improper because the jurors were

---

[12]The juror testified that she had sued several of her tenants for failure to pay rent.

[13]Although this finding is warranted, it is superfluous. The issue is not the Commonwealth's response had the juror been truthful; the issue is the capacity of this juror to participate in the process despite her material falsifications on the questionnaire. The court has an independent interest in the matter.

deliberating and there had been indication of deadlock. In other words, the defendant argues that an otherwise proper discharge of a juror became improper because of the time of the trial and state of the deliberations. The proposition is logically untenable and conflicts with the applicable statutes in any event. The two statutes governing discharge of a juror specifically authorize discharge during deliberations. See G. L. c. 234A, § 39 ("If, . . . after the final submission of the case by the court to the jury and before the jury has agreed on a verdict, a juror . . . is unable to perform his duty for any other good cause shown to the court, the court may order him to be discharged . . ."); G. L. c. 234, § 26B ("The court shall have authority to excuse and discharge a juror participating in jury deliberations after a hearing only upon a finding of an emergency or other compelling reason").

The defendant's contention that the judge dismissed the "one hold-out juror" is speculation. The judge found expressly that the jury was never deadlocked. Moreover, the judge found, and defense counsel recognized, that there was "no information whatsoever" of the position of juror no. 15. The defendant speculates that the return of the guilty verdict by the newly constituted jury on the next day indicates that the removed juror was the sole person holding out for acquittal. There is nothing in the record to support this theory.

The defendant argues in addition that the Commonwealth should not have inquired into the criminal record of the juror's husband. The judge found that the Commonwealth learned in a "benign" manner that the juror may have made material misrepresentations on her questionnaire and that the prosecutor's conduct was not improper. These findings are supported by the record. The Commonwealth's course of action was a reasonable way of confirming the accuracy of the victim witness advocate's perception and memory, and it was not contrary to anything we said in *Commonwealth* v. *Cousin, supra,* a case decided prior to the trial in the instant case. After the trial in this case, however, further experience with juror issues led us to conclude that, after the jury are sworn, "any check of CORI records or other inquiry into juror misconduct, whether sought by the prosecution or the defendant, may be done only with the approval of the trial judge." See *Commonwealth* v. *Hampton, ante* 152,

171 (2010). Accordingly, should a situation such as the one in this case arise in the future (recognition of a juror as a participant in a prior legal proceeding), the prosecutor (or defense counsel) must inform the judge of the issue and obtain court approval to undertake further investigation of the juror or anyone involved with the subject matter.

7. *Inquiry into deliberative process or declaration of mistrial.* The defendant asserts that there were three times during deliberations at which remedial action was necessary. He claims that at these times the judge should have realized that the jurors were not following the court's instructions and that there were "significant issues" with juror no. 15 (the juror who was eventually discharged) that should have caused the judge to inquire of the jurors or declare a mistrial. The defendant did not object at trial to the judge's actions at any of the three points now challenged.

The defendant bases his arguments on certain notes sent by the jury during deliberations. While the defendant labels these notes as evidence of misconduct, we do not view them as such. The notes did not disclose juror misconduct in the sense in which we have used that term. See, for example, *Commonwealth v. Cuffie*, 414 Mass. 632, 637-638 (1993) (juror visiting crime scene on own); *Commonwealth v. Fidler*, 377 Mass. 192, 197-201 (1979) (extraneous influences on jury). Rather, the notes reflect uncertainty among the jury regarding how to proceed with a hold-out juror.

We consider the judge's actions in the various situations as well within her discretion. See *Commonwealth v. Bryant*, 447 Mass. 494, 503 (2006). The defendant has the heavy burden of showing that "no conscientious judge, acting intelligently, could honestly have taken the view expressed by [her]." *Commonwealth v. Cruz*, 456 Mass. 741, 756 (2010), quoting *Commonwealth v. Druce*, 453 Mass. 686, 701 (2009). See *Commonwealth v. Bys*, 370 Mass. 350, 361 (1976). Reversal for abuse of discretion in these circumstances is rare.

We consider each of the occasions of which the defendant complains. First, the defendant cites the note from the foreperson to the judge on June 16 at 9:30 A.M., sent before delibera-

tions resumed that morning. This note referred to the existence of a deadlock and stated as follows:

> "The addition of [two] new jurors has not changed the position of the jury. At this point, all but one juror is in agreement and there is no hope of that one juror changing their mind. She began to feel verbally abused on Friday and is very upset."

The defendant maintains that this message indicated either that the jury had talked outside of deliberations[14] and decided to send the note to the judge, or that the foreperson had taken it on herself to send the note to the judge before deliberations began and without consulting the other jurors. Either action, claims the defendant, violated the judge's instructions: the jury should not have been discussing the case when they were not deliberating and the foreperson alone may not decide what to communicate to the court on behalf of the jury. In addition, the defendant states that the disclosure of the vote was in violation of the judge's instruction not to inform the court how the jurors "might stand at any particular time."

We are not persuaded that the inferences the defendant asks us to draw are necessary or even reasonable. The logical inference from the communication is that the two jurors discharged were not the individuals preventing a verdict. Thus, their discharge and replacement was not moving the jury closer to resolution because the hold-out juror remained. The message was superfluous because the jury of which the two excused jurors had been a part no longer existed. The jury were instructed to begin deliberations anew and we assume that they did so. See *Commonwealth* v. *Watkins*, 425 Mass. 830, 840 (1997).[15] The disclosure that the jury had been divided eleven to one, and that the one hold-out remained on the jury, had no harmful impact.

The defendant argues also that the judge should have inquired

---

[14]The jury had been instructed on the previous court day not to discuss the case again until they returned to the jury room to deliberate.

[15]In addition, when defense counsel voiced a concern that the jury had communicated improperly, the judge stated that she (the judge) had had the "note in hand before [she] asked the jurors whether they discussed the case with anyone, and they responded negatively." Thus, the defendant's claim is not supported by the record.

because the note quoted above indicated that it was juror no. 15 who felt "verbally abused" and was upset. Notwithstanding the defendant's claim, the foreperson's note did not identify the juror and did not provide a basis for inquiry. Tensions among jurors are expected and the note did not indicate any impropriety within the jury. "Tensions between jurors favoring guilt and those favoring acquittal is part and parcel of the internal decision-making process of jury deliberations." *Commonwealth* v. *Mahoney*, 406 Mass. 843, 855 (1990). Our law confines strictly the judge's authority to inquire into the deliberations in the jury room. See *Commonwealth* v. *Torres*, 453 Mass. 722, 732 (2009) (judge is to scrupulously avoid "invading the province of the jury"). See also *Commonwealth* v. *Francis*, 432 Mass. 353, 370-371 (2000); *Commonwealth* v. *Fidler*, 377 Mass. 192, 197-201 (1979). Moreover, as a result of the second note about a juror's medical condition, the judge did inquire of juror no. 15 about her health a few hours later. The juror did not indicate that she felt verbally abused or that she was upset.

Third, the defendant asserts that the foreperson was untruthful in the note sent to the judge on June 16, 2008, when she wrote:

> "One juror has expressed a concern that continued heated debate will cause a [flare up] of her medical condition. This type of heated debate would be required to make progress in the deliberative process. We are still at a deadlock."

The defendant appears to be arguing that eleven jurors conspired to convince the judge incorrectly that the hold-out juror was incapable of continuing to deliberate. His specific assertions are that this note "misled" the court into believing falsely that the juror had a medical condition that might be exacerbated by heated debate and that the note was sent improperly without the knowledge of the juror affected. This, the defendant contends, was contrary to the trial judge's instruction that any communication should be the result of a question from the entire jury. The judge responded to the note by inquiring of the juror. The juror said that she had an autoimmune disorder, "discoid and systemic lupus," but could continue to deliberate. The judge acted within

her discretion in determining whether the juror was at risk. She concluded permissibly that the juror's medical condition did not present any difficulty and that the juror could continue to deliberate. In addition, the note was not improper. By acting on the matter, the judge found implicitly and permissibly that the note reflected the view of the jury as a whole. The defendant's claim that the note "purposely misled the [c]ourt" so as to effect the juror's removal is speculative and without record support.

The defendant cites *Commonwealth* v. *Torres, supra,* for support. In that case, a note suggested that a juror was refusing to deliberate; the judge conducted a voir dire of the juror and determined otherwise. We concluded that the judge acted permissibly. Here, the judge handled the situation as it was handled in the *Torres* case. The note indicated that juror no. 15 was ill and that her condition might worsen. The judge conducted a voir dire and determined that that was not the situation and returned the juror to deliberate. The *Torres* decision in fact supports the action by the judge in the present case. *Commonwealth* v. *Cuffie,* 414 Mass. 632, 636 (1993), also relied on by the defendant, is inapposite (judge refused to conduct voir dire of juror who had visited crime scene on his own). Here, the judge appropriately questioned the juror, and the judge's ensuing action was an not abuse of discretion.

8. *Improper communications.* The defendant maintains that there were improper communications between juror no. 15 and a court officer, wherein "[u]pon information and belief, juror [no. 15], . . . complained to a court officer about her treatment by the other jurors and was repeatedly told by that court officer to continue deliberations and work out the differences she had with the other jurors." The defendant offers no facts to support this speculation. Assuming, nevertheless, that the defendant's scenario is correct, the communication or communications simply reflect disagreement within the jury. The judge committed no error; the remark or remarks were not brought to her attention.[16]

9. *Review pursuant to G. L. c. 278, § 33E.* a. *Empanelment*

---

[16]The defendant filed a postverdict motion seeking permission to interview "dismissed trial juror." The motion was denied. The defendant makes no claim regarding the denial of the motion. In any event, the motion does not present any argument other than those raised in the defendant's brief.

*procedure.* We have reviewed the entire record and have considered all the issues on appeal. Though not raised by the defendant, we have reviewed the trial judge's empanelment procedure whereby he excused without further inquiry members of the jury venire who responded affirmatively to certain questions that the judge considered almost always "produce[] a disqualification." These questions were ones such as whether the jurors were biased or prejudiced, whether they would give more credence to police officers as witnesses, whether they had a hearing or language difficulty, or whether the jurors could not apply the burden of proof or presumption of innocence. The judge presented his suggested procedure to both the Commonwealth and defense counsel and both sides (defense counsel after consultation with the defendant) agreed with its use.

In *Commonwealth* v. *Foley*, 402 Mass. 703, 704-705 (1988), we considered a similar process in which the judge "set aside" (but did not dismiss) any venire members who raised a hand in response to any of the initial questions, including ones such as whether anyone knew or was related to the lawyers in the case or the potential witnesses, had read or heard anything about the case, or had expressed or formed any opinions about the case. These venire members were "set aside" to be used if a jury could not be selected from the remaining venire. The defendant objected to the procedure, but the objection was overruled. We discussed the importance of randomness in the jury selection process, see *Commonwealth* v. *Bastarache*, 382 Mass. 86, 103 (1980), and concluded that, although there was no statutory violation in the procedure the judge followed, the procedure was undesirable. "We think it better that a potential juror not be placed in a separate category to be considered further . . . only if a sufficient number of other persons cannot be found in the available venire." *Commonwealth* v. *Foley*, *supra* at 705-706. We advised: "[T]he question of disqualification for cause of a juror who answers one or more preliminary questions in the affirmative should be resolved in such a way that, if that person is found not to be disqualified, he or she should have the same prospect of sitting on the jury as do those persons who answer no preliminary question in the affirmative." *Id.* at 706.

The judge here acknowledged *Commonwealth* v. *Foley*, *supra*,

and stated that his practice had been to follow its advice, but that he wanted, for purposes of efficiency, to "revisit" it. We agree that there are differences between the cases. In the present case, the judge did not excuse jurors who responded affirmatively to the more routine questions; he "set[] aside" (or returned to the jury pool) only those whose answers he believed would result inevitably in their eventual exclusion. In addition, the defendant specifically agreed to the procedure.

We reiterate that a procedure that removes from the venire a potential juror whose unsuitability to serve has not been established is not advisable. However, the procedure used, even if error, did not result in a substantial likelihood of a miscarriage of justice. The defendant agreed to the procedure; no prejudice has been alleged or is apparent; and we cannot speculate whether any of the dismissed jurors would have been seated. However, to put to rest any residual uncertainty, pursuant to our supervisory authority under G. L. c. 211, § 3, we state that, in all criminal trials in which empanelment commences after the issuance of the rescript in this case, such a procedure is not to be used. We are not prepared to sacrifice the interest served by a random selection process to obtain an uncertain benefit in efficiency.

b. *Admission of DNA evidence.* In *Commonwealth* v. *Mattei*, 455 Mass. 840, 851-855 (2010) (*Mattei*), we held that standard (nuclear) deoxyribonucleic acid (DNA) evidence that a certain person could not be excluded as a potential contributor of the DNA at issue should not be admitted without accompanying statistical evidence of the likelihood that the test could not exclude other individuals in a given population. Here, a forensic examiner testified that Turner could not be excluded as a potential source of the mitochondrial DNA found in a hair taken from the steering wheel of Vieira's car.[17] She stated also that the profile she obtained from the hair was the "exact same profile"

[17]The expert testified that nuclear deoxyribonucleic acid (DNA), found in the cell nucleus, is a combination of the DNA received from one's mother and father. She stated that nuclear DNA has sixteen "locations" and thirty-two "characteristics," and is "unique" to an individual. Mitochondrial DNA, in contrast, is found in the outer portions of a cell and is the DNA inherited from one's mother. The expert testified that it contains only one "location." Because it is shared by everyone with the same maternal relatives (e.g., maternal

as that obtained from Turner's oral swab. The expert did not offer any statistical testimony regarding the likelihood of a mitochondrial DNA match; she did state, however, that because it is shared by all maternal relatives, mitochondrial DNA can never be used to identify uniquely any individual. It is unnecessary on this record to decide if our holding in *Mattei, supra* at 855, applies to mitochondrial DNA testing that does not provide the same statistical calculations available from standard (nuclear) DNA testing. See *Commonwealth* v. *Linton*, 456 Mass. 534, 559-560 (2010). Here, there was no objection to the admission of the evidence, and we conclude that, if its admission were error, it did not result in a substantial likelihood of a miscarriage of justice.

We decided in *Mattei, supra* at 855, that the "nonexclusion" evidence without statistical explanation of its meaning was prejudicial error and necessitated reversal of the defendant's convictions.[18] The DNA evidence in that case was "crucial" to the Commonwealth's case. It was the only evidence that placed the defendant in the victim's apartment where the assault had occurred; in addition, the prosecutor emphasized the importance of the nonexclusion result in the closing argument. See *Mattei, supra* at 855-857. By contrast, in the present case, the nonexclusion evidence was of marginal significance. Apart from the DNA evidence regarding the hair, there was evidence that Turner and Vieira were friends and that Vieira often gave his friends rides in his car; the fact that a hair consistent with Turner's hair was in that car was thus of limited value to the Commonwealth. The minimal significance of the evidence is underscored by the fact that the Commonwealth did not mention it in closing argument.

The present case is more analogous to the case of *Com-*

---

grandmother, mother, siblings), mitochondrial DNA is never unique to an individual. The expert testified further that mitochondrial DNA testing may be used in situations such as the testing of the hair in this case, where the hair follicle necessary for nuclear DNA testing is not available.

[18] In *Commonwealth* v. *Mattei*, 455 Mass. 840, 848 (2010), the defendant objected to the admission of the challenged testimony. We therefore considered whether the error was prejudicial, a standard more favorable to the defendant than the one applied here for review of unpreserved error. See *Commonwealth* v. *Flebotte*, 417 Mass. 348, 351, 353 (1994).

*monwealth* v. *Linton, supra.* In that case, a DNA analyst testified that the defendant could not be excluded as a potential source of the DNA recovered from the fingernail scrapings taken from the victim. Because the defendant was the victim's husband, it was of "limited significance" that small amounts of his DNA were found under her fingernails. Accordingly, we concluded that the DNA evidence, "considered in the context of the evidence as a whole," if error, did not create a substantial likelihood of a miscarriage of justice. *Id.* at 560. Similarly, we are satisfied here that, in the context of the entire case, admission of the nonexclusion evidence without qualifying statistical evidence, if error, did not result in a substantial likelihood of a miscarriage of justice. See *id.*

10. *Conclusion.* We discern no reason to order a new trial or reduce the convictions of murder in the first degree to a lesser degree of guilt.

*Judgments affirmed.*